Walter L. REAZIN, M.D.; HCA Health Services of Kansas, Inc., d/b/a Wesley Medical Center; Health Care Plus, Inc.; and New Century Life Insurance Co., Plaintiffs and Counterclaim Defendants,

v.

BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Defendant and Counterclaim Plaintiff,

and

HMO KANSAS, INC., Additional Counterclaim Plaintiff,

v.

HOSPITAL CORPORATION OF AMERICA, Additional Counterclaim Defendant.

No. 85–6027–K.

United States District Court, D. Kansas.

May 23, 1986.

Robert H. Rawson, Jr., of Jones, Day, Reavis & Pogue, Cleveland, Ohio, Donald R. Newkirk, of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for plaintiffs and counterclaim defendants.

Dan R. Shulman, Minneapolis, Minn., Michael J. Unrein and Gary McCallister, of Davis, Unrein, Hummer & McCallister, Topeka, Kan., Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., for defendants and counterclaim plaintiffs.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

The parties to this action are Hospital Corporation of America (HCA) through its subsidiary, HCA Health Services of Kansas, Inc., doing business as Wesley Medical Center (Wesley); Health Care Plus, Inc. (HCP), and New Century Life Insurance Co. (New Century), both HCA subsidiaries; Walter L. Reazin, M.D. (Reazin); and Blue Cross and Blue Shield of Kansas (BCBSK). Plaintiffs contend BCBSK's threatened termination of its contracting provider agreement with Wesley, if carried out, will violate federal antitrust, state, and common laws. Defendant answered denying those allegations, and counterclaimed alleging an illegal boycott of its subsidiary HMO Kansas, Inc. (HMOK), and restraint of trade by HCA's acquisition of Wesley, HCP and New Century. Defendant requested, and was granted, permission to add HMOK as a counterclaim plaintiff, and HCA as a counterclaim defendant. (Memorandum and Order, Jan. 8, 1986, Rec. 24.) BCBSK then moved for summary judgment on the entirety of plaintiffs' complaint. (Rec. 50–51.) Oral argument on the motion was heard May 9, 1986. Upon full review of the parties' briefs, deposition testimony, evidence and arguments, the Court grants defendant's motion in part and denies it in part, as more fully explained below.

## FACTS

In accordance with the dictates of Fed.R. Civ.P. 56(d) the Court finds the following to be the material facts of the case existing without substantial controversy. The parties stipulated this Court has jurisdiction over the parties and venue is properly laid in this district. (Pretrial Conf. Order, p. 4, Rec. 76; hereafter "Stipulation—".)

### The Parties

BCBSK is a Kansas corporation organized and doing business in Kansas, with principal executive offices in Topeka, Kansas. Chartered under a special state enabling act, BCBSK is engaged in the business of providing private health care financing to businesses and individuals in Kansas, including businesses and individuals in Wichita and Sedgwick County. It also operates a health maintenance organization in Kansas through HMO Kansas, Inc. (HMOK), a wholly-owned Blue Cross subsidiary. (Stipulation h.) BCBSK's service area includes the entire State of Kan-

sas, with the exception of Johnson and Wyandotte Counties which are serviced by BCBS of Kansas City, a separate organization. (Stipulation j; Johnston Depo., p. 34.) BCBSK and its subsidiary, HMOK, compete with plaintiff HCP in the private health care finance markets in the State of Kansas and Sedgwick County. (Stipulation k.)

Blue Cross of Kansas, Inc. was formed in 1941 pursuant to special enabling legislation passed by the Kansas Legislature, and was organized as a private mutual nonprofit hospital service corporation pursuant to K.S.A. 40–1801 *et seq.* The primary purpose of Blue Cross of Kansas, Inc. was to provide private health care financing to its subscribers covering health care costs. (Stipulation 1.) In 1983 BCBSK was formed by combining Blue Cross of Kansas, Inc. and Blue Shield of Kansas, Inc., pursuant to enabling legislation. (Stipulation m.)

Under that enabling legislation BCBSK is required to pursue health care cost containment as the primary goal in conducting its business. (Stipulation o.) In the past Blue Cross utilized retrospective reimbursement contracts with Kansas hospitals, providing direct reimbursement on the basis of 104% of allowable costs. (Stipulation p.) Under this "charge reimbursement program," Blue Cross held the right to approve hospital budgets and rate structures, and agreed to pay unlimited charges based on approved rate structures. This program resulted in wide differences in payments to hospitals even in the same geographic area for equivalent diagnoses. (Chase Depo., p. 33.) In the late 1970's, Blue Cross developed a new prospective rate contract for hospitals and encouraged all hospitals in the state to continue as participating providers under the contract. (Stipulation p.)

On January 1, 1984, BCBSK offered a new contract known as the "Contracting Provider Agreement (Hospital) of the Competitive Allowance Program (CAP)", and again encouraged all hospitals to participate. (Stipulation p.) The CAP program established the maximum amount BCBSK would reimburse a provider for services within a particular diagnostic related group (DRG). In cases where a patient remains in a hospital and generates more charges than the established allowable, BCBSK nevertheless reimburses the hospital only up to the CAP amount. (Chase Depo., p. 33.) CAP is designed to guarantee BCBSK receives competitively favorable reimbursement levels from participating hospitals, thereby insuring BCBSK can continue to offer a competitively priced product to the subscribing public. (Johnston Depo., p. 180.) CAP also acts to control health care costs by providing hospitals incentives for cost effective management. (Chase Depo., p. 33.)

Under the contracting provider agreements hospitals provide services to BCBSK subscribers, which services are covered by the subscribers' BCBSK insurance policies. The contracting provider agreements contain a number of cost containment provisions, perhaps the most important of which requires the hospital to accept the "maximum allowable payments" (MAPs), established by BCBSK for various services, as payment in full for those services provided BCBSK subscribers. This "hold-harmless" provision ensures subscribers will not receive bills for covered services in excess of the amount BCBSK pays a participating hospital; it protects subscribers by assuring predictability of their health care expenses. (Stipulation o.)

The MAP program is not a guarantor of ultimate cost containment, but an initiative by BCBSK to inhibit premium rate increases for its subscribers. (Johnston Depo., p. 176.) BCBSK establishes MAPs within various "peer groups" within the State of Kansas. Peer Group V, including the four Wichita hospitals, is one of two geographically determined peer groups in the state; Topeka hospitals constitute the second geographically determined peer group. Peer groups for the remaining Kansas hospitals are established on a statewide basis by reference to hospital size. (Stipulation t.)

Another important provision of the contracting provider agreements is the "most favored nations" clause, stating that if a hospital decides it can provide services at charges less expensive than the MAPs, BCBSK subscribers will have the benefit of the less expensive charges. (Johnston Depo., p. 181.) The clause states:

In the event that the hospital has entered into an agreement with any other party under which such hospital agrees to accept an amount for any or all services as payment in full which is less than the amount such a hospital accepts from BCBS as payment in full for such services, such lesser amounts shall be the maximum allowable payment hereunder. Further, if the hospital provides discounts for cash or for other payment arrangements on a routine basis, such discounted amounts shall be the MAP hereunder if that amount is less than the MAP. The hospital agrees to fully and promptly inform BCBS of the existence of such agreements or discounts and their effect on the amounts which are accepted as payment in full. This paragraph shall not be construed as applying to reimbursement arrangements between the hospital and a BCBS owned or operated HMO operating under a certificate of authority issued by the State of Kansas, or reimbursement under Titles XVII, XIX and V of the Social Security Act.

(*Id.*, p. 185; Depo. Exh. 14, p. 4.) This clause requires a contracting hospital to give BCBSK the most economical rate the provider can charge, whether or not that rate is given to competing third party payors. BCBSK does not want other insurance companies receiving lower rates from its contracting hospitals. (*Id.*, p. 182.) Contracts of other insurance carriers contain similar clauses. (*Id.*, p. 184.)

Under the BCBSK enabling act, hospitals are not required to contract with BCBSK but in their own discretion are permitted to choose either contracting status ("participating hospitals"), or noncontracting status ("nonparticipating hospitals"). (Stipulation n.) BCBSK's historic policy has been to enter contractual arrangements with as many Kansas hospitals as possible in an effort to contain costs (Haas Depo., p. 45), and to encourage hospitals to remain on participating status (Johnston Depo., p. 168). The benefits to a participating hospital are significant; periodic interim payments from BCBSK; on-line electronic verification of patient benefits; predictability of, and prompt direct payment of benefits; a corresponding good cash flow and reduced or eliminated potential for bad debts; tape-to-tape billing programs; listing in the BCBSK directory of providers; a better and valuable public image of providing high quality care at reasonable cost; representation on the BCBSK Board of Directors; and access to newsletters, manuals and training. (Stipulation n; Johnston Depo., pp. 73, 162–65; Chase Depo., p. 34.) BCBSK obviously benefits from hospitals remaining in participating status, guaranteeing the best possible price for services provided to its subscribers, and assuring its subscribers will not be exposed to excess charges beyond those prices. (Stipulation o; *passim.*)

In general, the disadvantages associated with noncontracting status cut broadly and deeply, injuring everyone concerned. It is unsatisfactory to merely state the hospitals simply lose the benefits they are otherwise entitled to. The loss of periodic interim payments and direct payment of benefits from BCBSK has a tremendous impact on the cash flow of a noncontracting hospital. Eliminating the tape-to-tape billing program requires the hospital to submit its claims on paper, a more costly and time consuming process for both the hospital and BCBSK. Part V.f. of the standard BCBSK subscriber agreement provides BCBSK will pay insurance proceeds directly to participating hospitals, but proceeds for medical services performed by noncontracting hospitals will be paid only to the subscriber and may not be assigned. BCBSK does not honor or recognize subscribers' assignment of benefits to noncontracting hospitals. (Stipulation hh, ii.) This is designed to have an adverse impact on the hospitals' accounts receivable and

bad debts, an incentive to encourage hospitals' participation. Indeed, BCBSK's entire program is designed to make it to the subscriber's disadvantage "to maintain a contractual relationship with an institutional provider that is noncooperative in future Plan activities." (Johnston Depo., p. 82, Depo. Exh. 3.) The subscribers lose the guarantee of coverage and are exposed to personal financial liability in the event the noncontracting hospital's charge exceeds the BCBSK MAP. (Manley Depo., p. 51.) Nor is BCBSK unscathed. In addition to the increased time and costs associated with processing paper claims from noncontracting hospitals, BCBSK cannot make available to its subscribers the unique hold-harmless provision of its contract; nonparticipation "certainly inhibits the effectiveness of [its] cost containment programs;" and BCBSK may lose subscribers. (Johnston Depo., pp. 84, 169–70; Chase Depo., p. 35; Haas Depo., p. 48; Manley Depo., pp. 88, 94–96.)

BCBSK is the largest private health care financing organization in the State of Kansas and in Sedgwick County. During 1985 all hospitals and approximately 90% of all physicians in its service area were under contract with BCBSK as providers of medical services to its subscribers. (Stipulation j.) BCBSK's subscriber enrollment is approximately 37% of the total population, both medically insured and that without insurance, in its service area. (Johnston Depo., p. 53; Miller Depo., p. 30.) That figure is down from a total 46% of the Kansas population insured by BCBSK in 1980. (Miller Depo., p. 180.) But BCBSK still accounts for over 61% of the earned health insurance premiums in its service area, while its next largest competitor, Bankers Life Insurance Company, accounts for less than 4.3% of the earned health insurance premiums in the BCBSK service area. (113th Annual Report of the Kansas Dept. of Insurance.) Although there are a number of other insurance companies offering a range of products with competitive benefits, financial alternatives and more, BCBSK is unique in its hold-harmless provision under which a contracting provider

must accept BCBSK reimbursement as payment in full. (Johnston Depo., p. 60.) There are few, if any, other insurance programs offering Kansas subscribers the same opportunity of complete freedom of choice in selecting a health care provider that is available under the BCBSK CAP indemnity insurance program. (Chase Depo., p. 44.)

HCA is a Tennessee corporation with principal executive offices in Nashville, Tennessee. Through its subsidiary corporations HCA is engaged in the businesses of providing health care services, private health care financing and hospital management services throughout the United States. (Stipulation g.) HCA is the largest corporation in the country involved in ownership and management of acute health care facilities. (O'Brien Depo., p. 62.) But it is also a diversified company with a recognized policy of seeking "vertical integration" in the health care industry. HCA has, or is currently pursuing, interests in a nursing home company, a medical supply company, health and medical equipment companies, and insurance and third party insurance administrator companies. (Stewart Depo., p. 98; Kilissanly Depo., p. 100.) In 1985 HCA acquired Wesley, HCP and New Century, which are now wholly-owned subsidiaries of HCA. (Stipulations g, u, v, w.)

Wesley is a Kansas corporation with principal executive offices in Wichita, Kansas. Wesley is located in Wichita and provides health care services to residents of Wichita, Sedgwick County, and the State of Kansas, as well as out-of-state patients. (Stipulation d.) It is a tertiary care hospital with a higher degree of sophistication and specialization in its services than is available at primary or secondary care institutions. (O'Brien Depo., p. 147; Sullivan Depo., p. 15.) Additionally, Wesley is a major teaching hospital with a strong medical education program. (Sullivan Depo., p. 14.) Wesley is one of four incorporating hospitals which formed "Health Frontiers", a network of some 30 hospitals located in Kansas, Nebraska and Oklahoma, created

to undertake affiliated group programs including joint purchasing, sharing of office services and expertise, economies of scale, etc. (O'Brien Depo., p. 80.) Wesley has been under contract with Blue Cross since the 1940's, and was a charter member of the original Blue Cross program formulated under the Kansas enabling statute. The hospital has been a participant in BCBSK's CAP program from its inception in 1984. (Stipulation q.) Wesley is currently a party to a contracting provider agreement with BCBSK, under which Wesley agrees to provide acute care services to BCBSK subscribers and accept the BCBSK maximum allowable payment (MAP) for those services as payment in full. That contracting provider agreement became effective July 1, 1985 and was delivered by BCBSK in the middle of that month. (Stipulation r.)

Health Care Plus is a Kansas corporation established in early 1981, with principal executive offices in Wichita. HCP is a health maintenance organization (HMO), providing private health care financing to businesses and individuals in Kansas, including Wichita and Sedgwick County. (Stipulation e.) Following its acquisition by HCA, HCP began marketing its products in Texas, Louisiana, Arkansas and Missouri, as well as continuing its efforts in Kansas. (Kilissanly Depo., p. 137.)

New Century is a California corporation with principal executive offices in Nashville, Tennessee. New Century is engaged, *inter alia*, in the business of providing private health care financing to businesses and individuals. (Stipulation f.) New Century was issued a certificate of authority to do business in Kansas June 10, 1983. It is currently seeking regulatory approval to begin selling health care financing products in this state, and although delayed, this approval is expected sometime this year. *Id.* Once state approval is acquired HCP, rather than New Century itself, will be marketing the New Century products. (Kilissanly Depo., p. 41.)

Plaintiff Reazin is a medical doctor and a partner in Hillside Medical Office in Wichita. (Stipulation c.) Dr. Reazin is on the medical staff at Wesley providing medical services to the hospital's patients; during most of the time period relevant to this suit Dr. Reazin was also Chairman of the Board of Trustees of Wesley. (*Id.;* Reazin Depo., pp. 12–13.) He is a BCBSK subscriber by virtue of his partnership in the Hillside Medical Office, which has a subscriber agreement with BCBSK. (Stipulation b.)

*The Market*

During 1984, there were four Wichita hospitals competing for patients. Wesley, with 798 beds, garnered approximately 43% of all Wichita inpatient admissions; St. Francis Regional Medical Center (St. Francis), with 776 beds, obtained approximately 30% of the admissions; St. Joseph's Medical Center (St. Joseph), with 565 beds, held slightly over 22%; and Riverside Hospital (Riverside), with 125 beds, secured approximately 5% of the total admissions. (Berry Depo., p. 93; BCBSK Exh. 80.) Wesley was by far the strongest of the four Wichita hospitals. (BCBSK Exh. 105, p. 5.)

In this market there were over 200 indemnity insurers doing business with these four hospitals as third party payors. (Sullivan Depo., p. 168.) BCBSK was premier among those insurers, occupying a unique market position because of its statutory mandate under Kansas law to reduce health care costs. *(Id.)*

The economic forces and changes experienced by the health care service and insurance industries throughout the last decade play a significant role in this case. BCBSK Exhibit 156, an "Environmental Trends" report prepared by the HCA Center for Health Studies, provides a good deal of background material necessary to understand what motivated these parties to act, and react, as they did.

The macroeconomic trends affecting all sectors of the economy include three particular characteristics acutely affecting health care service and insurance. Long-term structural changes occurring in our country's economy reflect shifts away from manufacturing, agriculture and raw materials toward a service and information

economy; toward continued reduction or elimination of regulations originally established to protect industries and/or consumers; and toward major restructuring in established industries, resulting in expanded, intensive competition. A "bimodal" population is developing, concentrating numbers in the elderly and the maturing "baby boomers" groups, with corresponding changes in consumer sophistication, income levels, and spending priorities. Finally, there is rapid change in information and biological technology, impacting health care through increased productivity, more effective diagnostics and treatment, and increased competition for capital. (BCBSK Ex. 156, summary and pp. 1–7.)

The effect of these and other changes on the health industry have been, and continue to be, severe. The inpatient market has experienced a dramatic decline. Nationally, total hospital inpatient admissions dropped 7.3% from the first quarter of 1983 through the third quarter of 1984. Even within the group of patients continuing to seek hospital inpatient services, the lengths of stay have decreased significantly. Between 1983 and 1984, lengths of stay dropped 5.3% for the under 65 population and 10.8% for the 65 and over population. The existing market forces of increased competition, new payment systems, health care cost concerns, new delivery systems and technologies, and consumer preferences are acting to cause further reductions in discretionary inpatient utilization. (BCBSK Exh. 156, pp. 8–11.)

The federal and state governments are seeking to restrict their roles as purchasers of health care services because of the continued high cost. In 1983, the federal government switched from the "cost plus" system of Medicare and Medicaid reimbursement to a market-driven system with a schedule of fixed payments to providers for diagnostic related groups (DRGs). The new system has prompted physicians to rethink their practice patterns for all patients and encouraged hospitals to better manage utilization. In 1984 BCBSK followed the government's example and implemented the CAP program with fixed DRG payments in Kansas. Both federal and state governments are considering regulatory solutions to the problems of health care cost and indigent care. Some states have placed moratoriums on new hospital beds; others are restricting hospital acquisitions by investor-owned companies; and still others are considering rate setting systems designed to both control costs and resolve the indigent care issue. The need to control quality of care becomes more important and difficult given the continued decline in inpatient volume and growing pressures to cut costs. (BCBSK Exh. 156, pp. 17–19.)

Within the health care service sector, there are emerging a number of alternatives to the traditional inpatient setting. Outpatient surgery centers are expected to grow in number by 177% from 1984 to 1988. The cost savings for services obtained at these outpatient centers, as opposed to inpatient services, is substantial, ranging from 38% to 59% for particular services. Up to 60% of all surgical procedures can now be performed on an outpatient basis. Freestanding minor emergency centers (often called "urgent care centers") continue to grow in number, as do birthing centers in which it is projected 30–40% of all births will occur by 1990. Technological developments, patient acceptance, financial incentives and investor interest all encourage the growth of these and other alternative services and settings. These outpatient alternatives place hospitals' inpatient business at risk, and drive the hospitals themselves to expand and offer an increasing number of market-driven outpatient delivery alternatives. (BCBSK Exh. 156, pp. 20–22.)

The distinction between health care providers and insurers is blurring with the rapid development of "brokered" arrangements for the purchase and provision of health services. These brokered arrangements may be sponsored by hospitals, physicians, insurers, or a combination of the three, and may be negotiated through a number of different vehicles including health maintenance organizations (HMOs),

preferred provider organizations (PPOs), or other direct contract agreements. Whatever their form, these brokered arrangements share three common elements: the sale of health benefits in a wholesale market to group purchasers attempting to obtain health services for less than full retail price; a contractual arrangement between providers and purchasers more narrowly restricting consumer choice to a select provider panel; and management systems designed to insure cost effective utilization of health services. Brokered arrangements are fueled both by demand, from businesses and governments as major purchasers of health services seeking to control and/or reduce their health expenses while assuring beneficiaries receive quality services, and by supply, from health care providers seeking to protect and/or increase their market share of patients in light of decreasing inpatient utilization and increasing competition. The growth in HMO membership is expected to exceed 300% by 1990. The Medicare and Medicaid programs have consistently encouraged the growth of HMOs. Nearly two-thirds of the companies surveyed in a 1984 study had incorporated HMOs into their medical plans as a cost control option. PPOs continue to grow at a significant rate. The plans which will succeed as brokered arrangements are those which can: offer, either themselves or through contract affiliations, a full range of health services; control the costs of their benefit packages; maintain quality of care; and aggressively market their product. (BCBSK Exh. 156, pp. 12–14.)

The merger of health services and insurance goes beyond the development of brokered arrangements. As a result of a growing market for integrated health care delivery and financing systems, the health care product is being "repackaged" with hospitals and hospital companies integrating into health insurance functions, while insurance companies are developing networks of health care providers. Market forces influencing this consolidation and integration include: fixed price and capitation payment programs from government,

business and insurance companies; payors assuming the role of purchasers, seeking a package of health services and financing; consumer awareness of, and increased responsibility for, ever increasing portions of their health care bills resulting from increasing co-payments and deductibles; and competition and excess capacity leading to provider and insurance company initiatives to improve market position. (BCBSK Exh. 156, pp. 15–16.)

All of these trends, and their impact, were felt in Kansas. For example, during the last four years the number of inpatient admissions and lengths of stay in Kansas have dropped precipitously, leaving a growing number of empty hospital beds. It is an insidious cycle, requiring providers to allocate costs over fewer patients, raising patients' costs and regenerating the downward pressures. (O'Brien Depo., p. 161.) Recognizing this emerging, intensely competitive market, BCBSK acknowledged there is a potential for closing or modification in use of some hospitals. (Johnston Depo., p. 129, Dep. Exh. 6.)

Under conventional indemnity insurance arrangements, hospital and other contracting providers are reimbursed by the carrier for services rendered its subscribers on an "as needed" basis. There is no incentive to economize, using the most cost effective methods of practicing medicine, and conventional indemnity arrangements are perceived as giving rise to overuse of medical services. (Johnston Depo., p. 41.) This, combined with other trends in the health industry, resulted in the emergence of health maintenance organizations (HMOs) and preferred provider organizations (PPOs). Both are prospective reimbursement arrangements based on predetermined monthly payments to providers to oversee all health care needs of a member individual or family. HMOs require their members to choose one primary provider from a select group, and secure all needed services from the provider chosen. PPOs allow their members to secure health services from any of their contracting providers, but that group is also select and does

not include all available providers in a given area. Health Care Plus (HCP) was first to enter the Kansas and Sedgwick County markets with its HMO. BCBSK attempted to follow with HMO Kansas (HMOK); it failed in Sedgwick County, and BCBSK then introduced Choice Care, a PPO.

HCP received federal qualification as an HMO in early 1981. With its license it also received the power to require employers to offer their employees an HMO option for health insurance. This mandate power did not mean the employers had to offer only HCP; the employers were simply required to offer employees *one* HMO from those in the market. However, HCP was the largest, if not the only, HMO then available. It used the federal mandate capability extensively, and successfully. By the end of 1984 HCP acquired 40,000 members in Wichita, representing 95% of its total business. (Kilissanly Depo., pp. 117–18.)

HCP's policy is to enter contracts with as many physicians as possible as primary care providers. Each physician is paid a capitation fee, a stated amount for each member choosing that physician as his or her primary provider. HCP does not enter separate contracts with specialists; rather, each primary care physician determines in his own discretion whether to refer an HCP patient elsewhere, after which HCP will pay the specialist's fees. A portion of the capitation fund, the "withhold", and a hospital fund are set aside by HCP to cover specialist and hospital costs for services rendered HCP patients. Those funds not used at the end of a year are returned to the contracting physicians, each of which receives a prorata share of the refund based on the number of HCP patients treated. (Alexander Depo., pp. 17–18.) Two of the most important physician groups contracting with HCP are the Wichita Clinic and Hillside Medical Office.

Although not contracting with specialists, HCP does contract with hospitals. HCP has capitation agreements with Wesley and St. Francis in Wichita. (Kilissanly Depo., p. 49.) Under these agreements the hospitals are paid a certain monthly figure per member. Those amounts are paid whether or not the members receive care at the hospitals, but if the members do seek services there the hospitals must provide care and are paid no more than the monthly capitation. (*Id.*, p. 50.) Wesley is paid an 80% capitation by HCP, that is, $11 per member for 80% of HCP's membership. (Berry Depo., pp. 124–27; Davis Depo., p. 85.) HCP has fee-for-service contracts with St. Joseph and Riverside hospitals in Wichita, under which those hospitals are not paid capitation but are simply reimbursed for any services which may be provided HCP members. (Kilissanly Depo., p. 50.)

At the end of 1983, HCP implemented a plan to become a for profit corporation. HCP faced financing difficulties at the time. Federal loan guarantees for HMO expansion were being reduced while HCP was attempting to expand from Wichita into other Kansas communities. To acquire the capital necessary for expansion, HCP became for profit and sold stock to investors. (Kilissanly Depo., p. 19.) HCP employees were offered stock at $.25 per share, and physicians who were contracting providers with HCP were offered stock at $1.00 per share, although it was not a condition they purchase stock to retain contracting status. (*Id.*, pp. 58–67.) At this point there was no discussion of going public with the company or seeking acquisition by others. (*Id.*, p. 19.)

Almost three years after HCP was established in the market, BCBSK implemented HMO, Kansas statewide in early 1984. (Knack Depo., p. 106.) In Sedgwick County and Wichita, HMOK encountered difficulty. Wayne Johnston, President of BCBSK, acknowledges HCP's lead time and federal mandate capabilities gave it a particular advantage in the market. (Johnston Depo., p. 57.) Both HCP and HMOK were "independent provider arrangement" model HMOs; HMOK did not develop a staff or group model which would have been different than HCP. Those employers mandated by HCP could not be mandated by HMOK because it was the same

HMO model. Rather, it was simply within an employer's discretion to substitute HMOK for HCP as the required HMO option. (Carmichael Depo., pp. 84–86.) Many did not. HMOK was a "carbon copy" of the HCP program, and many employers saw no reason to offer identical programs. (Kilissanly Depo., pp. 76–77.)

Further, the HMOK provider capitation rates were not significantly different than those of HCP. (Miller Depo., p. 56.) HMOK did offer physicians both limited and full capitation models. The limited model capitated only basic primary care services and paid for additional professional services on a fee-for-service basis. This limited model obviously meant lower risk for contracting providers. But HMOK's statewide policy was that a physician desiring to participate as a provider was required to accept from HMOK the same level of risk the physician had accepted in any contracts with other existing HMOs. Thus, physicians already participating in the HCP higher risk capitation model, similar to HMOK's full capitation model, were not offered HMOK's limited capitation model as an option. If they wished to participate in HMOK they were required to accept the full capitation model with corresponding higher risk. (Knack Depo., pp. 20–31.)

By July, 1984 HMOK had approximately 1800 members, and contracts with slightly over 100 primary care physicians in Wichita. (Knack Depo., pp. 115–16.) HMOK's contracts with the Wichita Clinic and Hillside Medical Office were terminated by those groups in August, 1984. BCBSK claims it was never given any reasons for those cancellations, but earlier there had been considerable concerns raised about the levels of HMOK capitation and reimbursement provisions, the lack of patient load, and corresponding risk to the physicians. (Knack Depo., pp. 120–23; O'Brien Depo., p. 172; Reazin Depo., pp. 18–19; Kilissanly Depo., pp. 73–76.) Following the groups' cancellations, there was a significant drop in the remaining number of physicians participating with HMOK. (Knack Depo., p. 117.) BCBSK withdrew HMOK from the Wichita market in late 1984, although the program remained in effect elsewhere in Kansas. (*Id.*, p. 115.)

### The Sales

In 1984 Wesley was by far the largest, strongest and most competitive low cost, not for profit tertiary care hospital in the area. Concerned more about Wesley's future than its current market position, in the fall of 1984 the hospital's administrators began a feasibility study of the sale of its assets to a well-financed, investor-owned for profit corporation. The factors which motivated this decision included many of the market trends and economic forces previously discussed. In Kansas there had been more than a 50% drop in the utilization rate of inpatient days per 1000. (O'Brien Depo., p. 153.) In addition to the reduced utilization rate, Wesley was faced with increasing regulatory controls and restricted revenue from third party payors; increasing competitive forces; and increasing capital requirements. Sale of the hospital's assets to a profit corporation was perceived as offering the following advantages unavailable under any of the other options considered: unlimited access to capital; system efficiencies (purchasing, marketing, accounting, regulation, etc.); reduced economic risk; improved market position; preservation of quality; and an expanded, enhanced health care mission. (Stewart Depo., pp. 104–05; BCBSK Exh. 31.) Although a number of profit corporations were initially considered as potential purchasers, the choice was quickly narrowed to HCA, "a clear leader in the field," and negotiations continued throughout the fall of 1984. (Reazin Depo., p. 78.) In November, 1984 the parties agreed to the sale of Wesley's assets for approximately $265 million, an "extraordinary" price. (*Id.*, p. 79.) Of that amount, approximately $65 million was used to retire debts, bonds and assumed obligations; the remaining $200 million went to Wesley Foundation, out of which a $30 million endowment will be paid to the United Methodist Church, the former owner of Wesley. (Stewart

Depo., p. 105.) HCA committed itself to local board control of the hospital, and Wesley has the right to repurchase the hospital at the end of five years if dissatisfied with its operation by HCA. (*Id.*, p. 107.) On July 11, 1985 HCA, through its wholly-owned subsidiary HCA Health Services of Kansas, Inc., acquired Wesley. (Stipulation v.) Wesley's for profit status required it to withdraw as a member of the Health Frontiers network of hospitals. Health Frontiers was dissolved and reorganized following the sale, and HCA/Wesley now has affiliation contracts with some of those hospitals. (Reazin Depo., p. 73; O'Brien Depo., pp. 81–83.) HCA is not currently negotiating for the purchase of any other Kansas hospitals, but it does have management contracts with hospitals in Coffeyville, Fredonia, and Emporia, Kansas. (O'Brien Depo., p. 84.)

Contemporaneous with HCA's purchase of Wesley, but prior to entering negotiations for the purchase of HCP, HCA acquired New Century on April 25, 1985. (Stipulation u.; Kilissanly Depo., p. 98.) At the time of its sale New Century was licensed to operate in over 20 states, including Kansas. HCA's plan was to develop a full line of preferred provider and health insurance products and market them throughout the country in competition with other indemnity insurers, including BCBSK. (Reeves Depo., pp. 16–23.) New Century is currently awaiting regulatory approval to sell its products in Kansas. (*Supra*, p. 11).

In early 1985, HCP began looking at the possibility of a sale to, or affiliation with, a large company to secure financing needed for national expansion. (Kilissanly Depo., pp. 90, 96.) St. Francis and Wesley were considered and approached, but they declined interest in the face of HCP's extensive financial needs. A.B. Davis, Chairman and Chief Executive Officer of Wesley, told HCP that HCA might be interested. (*Id.*, p. 112.) Negotiations between HCA and HCP resulted in the sale of HCP for $41.1 million. (*Id.*, pp. 125–26.) Through its subsidiary Health Care Plus of America, Inc., HCA acquired HCP on August 14, 1985.

(Stipulation w.) The purchase price was the equivalent of $18.00 per share of outstanding HCP stock. The employees who purchased stock at $.25 per share, and the participating physicians who purchased stock at $1.00 per share, made substantial profits from the sale. HCA assumed HCP's existing negotiations for acquisition of a third party health insurance claims administrator, which was completed by HCA in late 1985. (BCBSK Exh. 347.) HCP will be responsible for marketing New Century health insurance products in Kansas following regulatory approval. (Smith Depo., pp. 59–62.)

BCBSK repeatedly emphasizes HCA's goal of vertical integration in the health industry, and the effect of that goal on Wesley, HCP, New Century, BCBSK, and the Sedgwick County market. Both Wesley and HCP were aware of the vertical integration policy at the times of their acquisitions by HCA. Following these acquisitions HCA informed Wesley and HCP that HCA had channeling mechanisms to direct patients to HCA hospitals where feasible. (Bugg Depo., pp. 153–56; Kilissanly Depo., pp. 151–54.) But HCA had also assured HCP during negotiations that HCA would not attempt to force HCP to change the way it does business. HCP has always sought, and continues to seek, an insurance product with a broad provider base to maintain appeal to the subscribing public. (Kilissanly Depo., pp. 102–03.) Although there are HCA corporate objectives for its insurance services to identify and coordinate development with hospitals owned or managed by HCA, HCP personnel have found these hospitals unwilling to give discounts of any significance. (*Id.*, pp. 185–89.) HCP continues to contract with Wesley and the other three Wichita hospitals not owned or managed by HCA. Although Wesley does meet with HCP on a monthly basis to coordinate marketing and other efforts, Wesley has implemented its own PPO called "Care Plus Network", which competes with both BCBSK and HCP. Regarding the relationship between Wesley and HCP, HCA told Wesley person-

nel to "continue doing business as the Board of Trustees and management staff see fit." (O'Brien Depo., pp. 29–34.) From the time of Wesley's acquisition by HCA through the time of BCBSK's announced termination of Wesley as a contracting provider, there was no change in the manner in which Wesley interacted with BCBSK regarding that contract, and throughout Wesley remained one of the lowest cost providers in Wichita. (Johnston Depo., p. 203.)

### The Response

After abandoning HMOK in Wichita in late 1984, BCBSK attempted to re-enter the market the following spring with a preferred provider organization known as "Choice Care". Bids were solicited, and Wesley and St. Francis hospitals, bidding discounts in excess of 20% of their regular rates, were chosen as the successful bidders. (Knack Depo., pp. 81, 87–88.) But before BCBSK executed final agreements with these providers, it made modifications to Choice Care which changed the assumptions on which Wesley based its bid. Wesley anticipated only a small Choice Care physician provider base, approximately 35%, with stringent utilization controls to be exercised by BCBSK. After Wesley's and St. Francis' bids were accepted, BCBSK broadened the physician participation base and eliminated the physician at risk withhold, shifting responsibility for utilization control to the hospitals. (O'Brien Depo., p. 106.) Although the modified Choice Care program would have appealed to more physicians and subscribers, it exposed the hospitals to a higher financial risk for the same reasons. The hospitals' bids were calculated on assumptions of a certain patient load, and BCBSK's subsequent modifications meant the lower rates would be given to more patients than the hospitals anticipated. Choice Care provides no coverage to subscribers choosing a noncontracting hospital for nonemergency reasons. (Johnston Depo., p. 195.)

During the spring of 1985, BCBSK also attempted to reestablish a "new" HMOK in Wichita. The HMO under consideration was designed to limit the number of participating hospitals and physicians in a manner different from the HCP arrangement. (Dauner Depo., p. 129.) St. Joseph was first contacted by BCBSK about this program in early April, 1985 (Sullivan Depo., p. 69), and shortly thereafter St. Francis was included in their discussions. In the first meeting with St. Joseph, BCBSK's Vice President of Marketing, John Knack, indicated the original HMOK had been withdrawn because it entered the market after HCP was well established, and because HMOK's product was almost identical to that of HCP; there was no product differentiation. (*Id.*, p. 70.)

Wesley's annual contracting provider agreement with BCBSK became effective July 1, 1985, and that contract was delivered to the hospital in the middle of the month. (Stipulation r.) The BCBSK Steering Committee met on July 15 to consider a *4% increase* in hospital MAPs for 1986. (Johnston Depo., p. 207; Depo. Exh. 24.)

On July 24 John Knack, and Marlon Dauner, BCBSK Senior Vice President for External Affairs, met with Edmond Berry, Wesley's Senior Vice President and Chief Finance Officer, to discuss the Choice Care program. The BCBSK representatives attempted to respond to Wesley's concerns about the program and persuade Berry to act on the contract. Berry indicated he was facing problems with the HCA office in Dallas regarding the contract as written, and asked how Wesley could rebid the program. The BCBSK representatives replied they would not rebid. Berry responded Wesley desired to participate as a Choice Care hospital because " 'their intent was to put one of the other hospitals in Wichita out of business, and it was not the small hospital.' " (Knack Depo., p. 95; Dauner Depo., p. 67.) Berry acknowledges there may have been discussion "in a generic sense" about one of the Wichita hospitals going out of business and Wesley working with the other successful bidder in Choice Care, but denies making the statement that was Wesley's intent. (Berry Depo., pp. 46, 180.) Berry concluded the July 24 meeting

stating he would not approve the Choice Care arrangement. (Dauner Depo., p. 77.)

Knack and Dauner then proceeded to a scheduled meeting with St. Joseph and St. Francis representatives for further discussions on HMOK. Dauner stated they had just come from a meeting where Berry indicated " 'he was going to put one of you out of business.' " (Knack Depo., p. 100.)

Berry's alleged remarks were also communicated to the BCBSK Steering Committee on July 30, 1985. (Knack Depo., pp. 102–03.) At that meeting no decision was made on Choice Care responding to Wesley's concerns, nor was there any mention or discussion of terminating Wesley as a contracting provider under the CAP program. (Knack Depo., p. 103; Johnston Depo., pp. 205, 207.) On that same day BCBSK sent to Wesley the Choice Care contracting hospital agreement, and contracting hospital policies and procedures, requesting execution of the agreement no later than August 15, 1985 for an effective date of September 1. (Johnston Depo., p. 197; Depo. Exh. 20, 21.)

The termination of Wesley as a contracting provider was first considered by BCBSK in early August, 1985. (Johnston Depo., p. 208.) St. Joseph and St. Francis hospitals indicated they were seeking an equity position in any HMO to be offered, which BCBSK steadfastly rejected. On August 4 the hospitals met with Dauner, Knack, and Bill Pitsenberger, general counsel for BCBSK, to discuss whether those three men would be interested in leaving BCBSK to manage an HMO owned and operated by St. Joseph and St. Francis. Dauner, Knack and Pitsenberger indicated their interest in such a program but required a firm committment from the hospitals that same day. That commitment was not forthcoming, and the idea was dropped. (Dauner Depo., pp. 23–36; Carmichael Depo., p. 97.) Later that night the three BCBSK representatives developed what is now called "Kansas Health Plan", the new HMO ultimately implemented in cooperation with St. Francis and St. Joseph.

(Dauner Depo., pp. 33–34; Knack Depo., pp. 180–81.)

The BCBSK Steering Committee met the following day, August 5. The minutes of that meeting state that "[c]onsiderable discussion occurred concerning the providers in the Wichita area, HMO, Choice Care, CAP, etc." (Johnston Depo., p. 213; Depo. Exh. 25, p. 2.) Following the formal meeting that morning, Johnston requested the committee to return in the afternoon, when the committee members discussed the general Wichita market and problems BCBSK encountered there. Although not reflected in the official minutes, the members concluded "it would be in the best interest of BCBS for a number of reasons to recommend to our Executive Committee we cease contracting with Wesley and HCA" as of January 1, 1986. (Johnston Depo., p. 214.)

On August 12, 1985, the Steering Committee voted to recommend the Executive Committee terminate Wesley as a participating hospital. David E. Manley, BCBSK Vice President of Subscriber Services, testified at his deposition the rationale for that recommendation was HCA's acquisition of Wesley and HCP and consequent control over both supply and demand, working to the detriment of BCBSK subscribers in Wichita and throughout the State of Kansas; "an assumption" HCA could direct its insured members to particular facilities to seek medical care. (Manley Depo., pp. 48–49.) Johnston testified the recommendation was based on the committee's perception of HCA's intent to pursue vertical integration and "dominate" the Wichita market; the committee's belief Wesley was not genuinely interested in doing business with BCBSK; and Berry's alleged comment regarding HCA's intent to put another Wichita hospital out of business. (Johnston Depo., pp. 216–20.)

At that same meeting the Steering Committee recognized that as a result of the proposed termination BCBSK would have a significantly different indemnity insurance product in Wichita, offering the CAP arrangement with only three of the four hospitals. Concerned over the marketability

of this resulting program, the Steering Committee further decided to seek a reduction in MAPs from the other three Wichita hospitals to acquire a competitive price advantage. (Knack Depo., p. 104: Dauner Depo., p. 82.) The committee also decided to recommend the Executive Committee abandon the Choice Care program in which Wesley was one of the successful bidders. (Knack Depo., p. 182; Dauner Depo., p. 80.) Although not a stated reason for recommending abandonment of Choice Care, Dauner acknowledges Choice Care would have competed with the Kansas Health Plan HMO then under negotiation with St. Francis and St. Joseph. (Dauner Depo., p. 79.)

The next day, August 13, Dauner and Knack attended another meeting with St. Joseph and St. Francis representatives, initially scheduled for further discussions on Kansas Health Plan. Dauner opened the meeting by announcing BCBSK was considering recommending its Executive Committee cancel Wesley's CAP contract. (Knack Depo., p. 183; Carmichael Depo., p. 33; Dauner Depo., p. 147.) Knack and Dauner stated that although they hoped BCBSK could form an HMO with the hospitals, whether or not that was successful BCBSK needed to protect itself and act to remain competitive faced with its biggest competitor, HCP. (Mackey Depo., p. 47.) BCBSK anticipated the CAP program would continue with St. Joseph, St. Francis and Riverside hospitals, "... in effect, a PPO." (Knack Depo., p. 184; Carmichael Depo., p. 34.) Knack and Dauner voiced their concerns over the marketability of the CAP program if the termination were carried out, and asked the hospitals for a 25% reduction in their rates to provide BCBSK a competitive price. (Carmichael Depo., pp. 34–35.) Knack and Dauner also acknowledged that if BCBSK proceeded to terminate Wesley, it could result in short term losses for BCBSK (Knack Depo., pp. 197–98.) The hospitals were concerned about the proposed reduction in MAPs, and asked about the effect of Wesley's termination on their patient volume. Dauner replied he had no idea. (Dauner Depo., p. 86.)

The following day, August 14, Knack, Dauner, and Pitsenberger attended a meeting of the St. Francis Board of Directors where they discussed the proposed termination of Wesley and the requested reduction of MAPs. (Knack Depo., p. 186.) Knack referred to the possibility, but did not guarantee, that BCBSK subscribers might choose to use a hospital other than Wesley following its termination. (Carmichael Depo., p. 34.) Knack requested a response from St. Francis regarding the reduced MAPs by August 16, 1985; he told the Board he needed to make a presentation to the BCBSK Executive Committee and felt it would be helpful if he could then indicate St. Francis was willing to accept the lower rate of payment on MAPs. (Carmichael Depo., p. 36; Depo. Exh. 3, p. 7.) The St. Francis Board authorized its administrative staff "to negotiate a contract with Blue Cross after an appropriate discount percentage could be selected." (*Id.*)

BCBSK's contracting provider agreement with Wesley required 120 days notice for termination without cause. BCBSK was accordingly required to give Wesley notice of termination no later than September 1, 1985 for an effective termination date of December 31, 1985.

St. Francis personnel initially requested BCBSK apply the reduced MAPs only to new business and pay the originally proposed 4% increased MAPs for old business. BCBSK rejected that idea. (Carmichael Depo., p. 46.) St. Francis did not affirmatively respond to Knack by August 16 as requested, but in a telephone conversation that week between Knack and Bruce Carmichael, St. Francis' Vice President of Planning and Marketing, Carmichael rejected the proposed 25% discount because it was the hospital's "break even" point, but indicated St. Francis might be comfortable with a 20% discount. (*Id.*, p. 48.)

Representatives of BCBSK, St. Joseph, and St. Francis next met August 21, 1985. (Knack Depo., p. 191.) They discussed discounts for the Kansas Health Plan HMO, MAPs under the CAP program, and an

unspecified PPO. (*Id.*, p. 192.) Knack indicated the proposed Wesley termination had a good chance of being approved. (Sullivan Depo., p. 47.) He also commented on the impact of the proposed termination on the Wichita market, stating he expected Wesley's current 50% share of BCBSK business would be reduced following termination; either directly or indirectly he indicated that if Wesley's BCBSK patient volume was reduced the patients "would certainly go somewhere else in the Wichita area and that it could have a positive impact [with an] increased volume of BCBS patients at the other hospitals." (Sullivan Depo., p. 35.) BCBSK representatives again discussed with the hospitals a 25% rate reduction. (*Id.*, p. 37.)

St. Francis' management staff performed an internal computer cost analysis which showed a 20% MAP discount, with no increase in patient volume, would result in a $1.2 million loss for the hospital. But the same analysis showed that with even a 4% patient shift from Wesley, 2% each benefiting St. Francis and St. Joseph, St. Francis would acquire at least the 300 new patient admissions needed to maintain existing levels of profitability with the proposed reduction in MAPs. (Carmichael Depo., pp. 51–53; Depo. Exh. 4.) This was an acceptable level of risk for St. Francis. (*Id.*)

St. Joseph personnel did not need a computer to account for patient shifts in deciding their course of action on the proposed reduction of MAPs. That hospital had voluntarily terminated its BCBSK CAP contract for a period of time during 1981, and experienced firsthand the reduction in BCBSK patient volume that accompanies noncontracting status. (Sullivan Depo., p. 45.) St. Joseph was confident the proposed termination of Wesley would reduce the number of BCBSK patients seeking care at Wesley; St. Joseph was amenable to a discount because of the prospect of greater patient volume. (*Id.*) Indeed, the "change in patient volume ... was the basis for the discount to begin with." (*Id.*, p. 67.)

On August 23, Carmichael from St. Francis, and Edward Sullivan, St. Joseph's Vice President of Administration, met. Sullivan believes Carmichael could have informed him at this time St. Francis had accepted the reduced MAPs. (Sullivan Depo., pp. 59–60.) The hospital representatives also further formulated and discussed the Kansas Health Plan HMO, with the two hospitals as owners and BCBSK handling marketing and claims processing. (Carmichael Depo., pp. 113–14; Mackey Depo., p. 61.)

That same day Wayne Johnston, President of BCBSK, sent a letter to the members of the BCBSK Board of Directors Executive Committee calling a special meeting on August 29: "We have a critical decision to make regarding contracting with hospitals. We found it necessary to call a special meeting of the Executive Committee to consider this critical issue before the scheduled September meeting.... I am enclosing a few articles that I hope will indicate ... some of the new competitive pressures we feel developing.... I think it will become evident that many new competitors are coming on the scene and we will shortly see health care cost price wars." Accompanying the letter were reports and articles detailing the operations and plans of the following health care and health insurance corporations: HCA; American Medical International; National Medical Enterprises; Humana; U.S. Health Care Systems; Prudential; and Cigna. (Johnston Depo., p. 228; Depo. Exh. 28.)

At the August 29 Executive Committee meeting Johnston made a presentation describing BCBSK's present and future positions, general trends in the health care industry and specific trends perceived in the Wichita market. He expressed concerns about price wars, vertically integrated competitors, quality of care and potential closings of hospitals for economic reasons. (Johnston Depo., pp. 229–236.) The question Johnston requested the committee to act on was:

Does Blue Cross and Blue Shield of Kansas wish to continue to do business with entities that openly desire to compete with the organization and enroll Blue

Cross and Blue Shield subscribers in their programs?

(Johnston Depo. Exh. 29, p. 5.) Johnston said "the real issue is not HCA, it is not Wesley ... but who do we align with while we still can and get a product with a price subscribers can afford." and "I don't think staff is acting on Wesley per se or HCA per se." (*Id.*, pp. 11, 14.) Following further discussion the committee voted "no" to the question posed, agreeing to terminate the existing Wesley contracting provider agreement effective December 31, 1985. (Stipulation x.) The Chairman of the BCBSK Board of Directors testified in his deposition:

> It was my perception that we were trying to preserve our fair share of the market, that we should take a stance of self-preservation against the dominant force that seems to be an adverse influence, or indirect, undeniable influence in the market in Wichita and surrounding areas. I think we have an obligation as a board member [sic] to preserve the interests of BCBS, to protect the subscribers of BCBS.

> \* \* \* \* \* \*

> I think they [HCA] were improperly invading the market. We could see an erosion of membership in our health maintenance organization. We could see the weakening of our position in that area due to their invasion into that health care field.

(Haas Depo., pp. 69–70.) As of August 29, 1985 Wesley had not done anything in dealing with BCBSK or its subscribers which threatened BCBSK; the decision to terminate the hospital "was not based on what they had done at that time, [but] more or less what their programs would do in the future." (*Id.*, pp. 71–73.) The cancellation of HCA was intended as " 'a message to the provider community that the benefits of contracting [with BCBSK] are so great that the Blue Cross relationship should figure into their day to day as well as long range plans.' " (Manley Depo., p. 99; Depo. Exh. 10.) The letter notifying Wesley of its termination was prepared and sent the same day.

Neither Wesley nor HCA were consulted or advised of BCBSK's plans prior to the August 29 meeting. During the meeting John Knack was stationed in Wichita anticipating the committee's decision and preparing, with the public relations staffs of St. Francis and St. Joseph, to respond to press inquiries. (Knack Depo., pp. 58–62.) Notwithstanding an earlier promise to O'Brien, Wesley's representative on the Executive Committee, to withhold public release of the decision until O'Brien could return to Wichita, BCBSK issued its press release that afternoon. (*Id.*, p. 67.) The release explained the rationale for the termination as follows:

> In the past few months, HCA has clearly announced its intention to enter into all lines of insurance and become a direct competitor of [BCBSK]. Their recent purchase of Health Care Plus is clear evidence of this.

(Manley Depo. Exh. 1.) In a meeting with the BCBSK marketing staff in Wichita on August 30, Knack stated they had chosen to disassociate with Wesley for one reason: HCA, the owner of Wesley, Health Care Plus, and other clinics, plans to become a direct competitor of BCBSK. (Cox Depo., p. 65; Depo. Exh. 2.)

BCBSK, St. Francis and St. Joseph reached a firm commitment to establish the Kansas Health Plan HMO on or about September 1, 1985. (Mackey Depo., p. 62.)

During September officials of Wesley and HCA communicated with BCBSK officials a number of times, attempting to persuade them to reverse the termination decision. In a meeting on September 5, and in telephone conversations September 9 and 10, Wayne Johnston indicated BCBSK might be willing to reconsider if he received assurances HCA "would not be competing with us in that environment," assurances that HCA would agree not to market its new products in competition with BCBSK; he later indicated no inclination to reconsider because "I don't hear you say that you are not going to compete with

Blue Cross." (Stipulations z, aa, bb; Dauner Depo., p. 175; Davis Depo., pp. 13–17; Johnston Depo., pp. 250, 257–58; Williamson Depo., p. 70.) At the September 5, meeting with Wesley officials, Johnston and Dauner related how they had been in discussions with St. Joseph and St. Francis during the previous weeks and felt the need to work with those hospitals very closely and carefully to avoid those hospitals' alignment with another insurance carrier which might "squeeze" BCBSK out of the Wichita market. Johnston also stated: "You know that one of the two hospitals, one of those other two hospitals, are [sic] probably not going to be there in a few years anyway. At that point in time, maybe we can get back together." (Davis Depo., pp. 19–21.)

Wesley officials requested, and were reluctantly granted, permission to address the BCBSK Executive Committee at its September 19 meeting. Following Davis' remarks to the committee requesting reconsideration of its decision, Johnston told the committee:

> I'm more convinced than ever that our decision was a proper one. I'm convinced that HCA will be vertically integrated and believe this was demonstrated by the fact they [sic] have already purchased an HMO and their strategy is to compete with [BCBSK].

(Johnston Depo. Exh. 34, p. 11.) The committee voted to reaffirm the termination. (*Id.*, p. 24.) At the same meeting the committee approved the newly reduced MAPs for Wichita pursuant to the agreement reached with St. Francis and St. Joseph. (*Id.*, p. 23.) Prior to this time BCBSK had never introduced revised MAPs other than on an annual basis. (Miller Depo., p. 191.)

Wesley responded to BCBSK's announcement by purchasing several newspaper advertisements in the Wichita Eagle-Beacon. In those advertisements, Wesley assured BCBSK subscribers that, notwithstanding BCBSK's action, Wesley would continue to accept Blue Cross reimbursement as payment in full and assist subscribers in claims processing. (Davis Depo., pp. 25–26.) Wesley has spent over $170,000 on its public relations campaign designed to minimize the impact of the announced termination. (Davis Depo., p. 26.)

BCBSK responded by running a full-page ad in the September 10, 1985 Wichita Eagle-Beacon. (Stipulation cc.) The ad, after announcing the termination decision, continued:

> Blue Cross and Blue Shield of Kansas will still have contracts with St. Francis, St. Joseph and Riverside Hospitals in Wichita as well as most acute care hospitals across the state. These contracts contain a unique "hold harmless" provision which protects Blue Cross and Blue Shield of Kansas subscribers. Our contracts with hospitals give our subscribers greater predictability of coverage. Subscribers do not have to worry about paying amounts over our allowances to Contracting Providers. They also know in advance what their out-of-pocket expenses will be.
>
> Beginning January 1, 1986, the method of reimbursement for Wesley Medical Center will be different. Payment will be only to the Subscriber, rather than directly to Wesley.
>
> If Wesley's charges are more than Blue Cross of Kansas allowances to other hospitals for the same services, the subscriber will be responsible for the difference.

On approximately the same date, BCBSK issued to its subscribers a publication entitled "Healthplan," which contained the same statements as the September 10 Wichita Eagle-Beacon advertisement. (Stipulation dd; Johnston Depo. Ex. 33, p. 2.) In fact, Wesley did agree to the 20% reduced MAPs even though in many cases it meant providing services below Wesley's costs of operation. (Davis Depo., pp. 24–26; Stewart Depo., pp. 13–15.)

BCBSK also abandoned the Choice Care program in Wichita as a result of its decision to terminate Wesley, although Choice Care continues to operate successfully in other parts of Kansas. (Johnston Depo., p. 222; Dauner Depo., pp. 67, 80.)

The short term effects of the decision to terminate Wesley are clear. Wesley will lose the benefits associated with contracting status. (*Supra,* pp. 6–8.) The termination was designed to send a "message" to other providers they could expect similar treatment if they decided to enter arrangements competing with BCBSK. (Morley Depo. Exh. 8; Sullivan Depo., pp. 121–22; Chase Depo., pp. 52, 56–57, 70–71, 83; Wilson Depo., pp. 39–45.) BCBSK faces the costs and consequences resulting when any hospital becomes a noncontracting provider. (*Supra,* p. 8.) In addition, BCBSK anticipates losing subscribers; in fact, in his deposition testimony Dauner stated he saw no benefits accruing to BCBSK over the next two or three years as a result of the decision. (Dauner Depo., pp. 158–59; Knack Depo., p. 198.) BCBSK rescinded its initial plans to terminate Wesley's lease on electronic data processing equipment and refuse to permit Wesley to submit claims on computer tape; Wesley will be permitted to make paperless claims submissions, but the change was made to ensure that decreasing BCBSK's paperless submissions "is in our best interest and is more harmful to Wesley" than to BCBSK. (Morley Depo. Exh. 10; Manley Depo., p. 102 & Depo. Exh. 11; Miller Depo. Exh. 9.) BCBSK also experienced significant resistance from its major employer groups, such as Boeing, Southwestern Bell, and the National Blue Cross Federal Employee Program. (Manley Depo., pp. 56–87; Depo. Exhs. 6 and 7.) HCP and New Century will be unable to compete with BCBSK on equal terms with St. Joseph, St. Francis and Riverside hospitals, and may face increased costs, both from those hospitals as a result of the drastic modifications to the CAP contracts and from Wesley as a result of the termination. (Kilissanly Depo., pp. 46–49; Bugg Depo., pp. 97–99; Smith Depo., p. 29.)

### The Suit

On November 12, 1985 plaintiffs filed a 17-count complaint against BCBSK. Counts I–III allege violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Counts IV—VI allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. Counts VII–XVII are pendent state law claims, including allegations of state and common law antitrust violations, violations of public policy and defendant's enabling act, and claims of breach of contract and tortious interference. Plaintiffs request actual damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under Section 16 of the Clayton Act. 15 U.S.C. § 26. (Rec. 1, 5–6.) Plaintiffs' motion for a preliminary injunction was brought to the Court's attention at a status conference November 21, 1985, but the parties mutually agreed Wesley's contracting provider agreement would remain in effect pending outcome of the suit, and the Court did not act on the requested injunction. (Memorandum Order, Nov. 22, 1985, Rec. 9.) Following the parties' agreement St. Joseph, with the support of St. Francis, sought to delay implementation of the reduced MAPs because Wesley would not be terminated effective January 1, 1986, and there would not be the change in patient volume they anticipated. (Sullivan Depo., pp. 63–66; Knack Depo., p. 213.) BCBSK refused the request, holding the hospitals to the CAP agreements they signed. (Knack Depo., p. 214.)

BCBSK now seeks summary judgment on the entire complaint for three reasons: plaintiffs HCP, New Century and Reazin lack standing; Wesley has no viable federal antitrust claims; and the pendent state claims are controlled by two decisions of the Kansas Supreme Court.

### STANDING

The first six counts of the complaint are plaintiffs' federal antitrust claims under Section 1 and 2 of the Sherman Act. Section 1 provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade among the several States ... is declared to be illegal....

15 U.S.C. § 1. Section 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or

conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states ... shall be deemed guilty of a felony....

15 U.S.C. § 2. Count I of the complaint alleges a restraint of trade by BCBSK, in concert with St. Francis, St. Joseph and Riverside hospitals, in unlawfully terminating Wesley's contract and refusing to deal with Wesley as a participating hospital. Count II alleges a further restraint of trade in violation of § 1 by BCBSK, through terminating Wesley and entering contracts with those hospitals, pursuant to which they or other providers of health care will boycott or otherwise refuse to deal with HCP, New Century, and other private health care financing organizations seeking to compete with BCBSK. Count III alleges those same acts are a restraint of trade violating § 1 because the other health care providers therein agreed not to compete with BCBSK. Count IV alleges a violation of § 2 because BCBSK, in terminating Wesley's contract, committed the offense of monopolization. Count V also alleges a violation of § 2 because BCBSK is engaged in an attempt to monopolize. Count VI alleges BCBSK is engaged in a conspiracy or conspiracies to monopolize in violation of § 2.

Section 4 of the Clayton Act authorizes private damage suits by persons injured in their "business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15. Section 16 of the Clayton Act authorizes private suits for injunctive relief "against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26. The remedies under the two sections, and therefore their standing requirements, are distinct.

### Section 4 of the Clayton Act

■ Read literally, Section 4 encompasses any harm even indirectly attributable to any antitrust violation. Congress intended the protections of the antitrust laws to extend to a broad range of potential victims. *Blue Shield of Virginia v.*

*McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2544, 73 L.Ed.2d 149 (1982). But there is "a point beyond which the wrongdoer should not be held liable." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 760, 97 S.Ct. 2061, 2082, 52 L.Ed.2d 707 (1977) (Brennan, J., dissenting). "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *McCready,* 457 U.S. at 477, 102 S.Ct. at 2547.

■ In order to maintain an antitrust action plaintiffs must show more than injury linked to a violation of the antitrust laws. Plaintiffs must prove "antitrust injury", defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick* plaintiffs sued under Section 7 of the Clayton Act, claiming defendant Brunswick's acquisition of rival bowling alleys would tend to lessen competition. Damages claimed were lost profits plaintiffs would have realized had the competitors been allowed to go out of business. The Supreme Court rejected plaintiffs' position, finding they were actually complaining about increased competition and their inability to profit from increased market concentration. *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697. The court disagreed with the Ninth Circuit's ruling any loss "causally linked" to "the mere presence of a violator in the market" was compensable. *Id.* at 487, 97 S.Ct. at 696, *quoting* 523 F.2d at 272–73. The court concluded that to permit plaintiffs to proceed on such a theory would separate antitrust recovery from the promotion of competition, the singular purpose of the antitrust laws. *Id.* 429 U.S. at 490, 97 S.Ct. at 698. This principle was most recently applied in *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. ——, ——, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538, 550 (1986), holding respondents could not recover for petitioners' alleged conspiracy

to charge higher than competitive prices; even though such conduct would violate the Sherman Act respondents as petitioners' competitors, stood to benefit from any conspiracy to raise the market price of the product.

In *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), defendant Blue Shield refused to reimburse its subscribers for services obtained from a psychologist, although covering services provided by psychiatrists. The issue was whether an individual subscriber who had been denied reimbursement for psychological services had standing under Section 4 to sue Blue Shield for an unlawful conspiracy to restrain competition in the psychotherapy market. The court concluded she did. 457 U.S. at 484, 102 S.Ct. at 2551.

▮ The *McCready* analysis began with the principle Section 4 " 'does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.' " 457 U.S. at 472, 102 S.Ct. at 2545, *quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed.2d 1328 (1948). Section 4 is applied in accordance with its plain language and its broad remedial and deterrent objectives. However, the Section 4 remedy is limited to particular classes of persons. Thus, a state may not sue in its *parens patriae* capacity for damages to its general economy because consumers themselves may sue for injuries to business or property. This limitation is designed to avoid double recovery. *Id.* 457 U.S. at 473, 102 S.Ct. at 2545, *citing Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The Section 4 remedy is also limited to particular forms of injury. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), recognizing the unacceptable risk of duplicative recovery implicated by allowing both direct and indirect purchasers of a product

to sue, the court held an indirect purchaser may not claim damages from an antitrust violator measured by the amount of overcharge passed on, concluding direct purchasers are the injured parties who as a group were most likely to press their claims with the vigor the Section 4 treble damage remedy was intended to promote. In *McCready*, the court noted:

> If there is a subordinate theme to our opinions in Hawaii and Illinois Brick, it is that the feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4. Where consistent with the broader remedial purposes of the antitrust laws, we have sought to avoid burdening § 4 actions with damages issues giving rise to the need for "massive evidence and complicated theories," where the consequence would be to discourage vigorous enforcement of the antitrust laws by private suits. Thus we recognized that the task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system. In addition, while "[d]ifficulty of ascertainment [should not be] confused with right of recovery," § 4 plainly focuses on tangible economic injury. It may therefore be appropriate to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm.

457 U.S. at 475, n. 11, 102 S.Ct. at 2546, n. 11 (citations omitted). The court found McCready's claim presented no possibility of imposing duplicative damages against defendants because plaintiff had already paid the psychologist who therefore suffered no injury, and because the subscriber, rather than her employer who purchased the Blue Shield plan, was out of pocket as a consequence of plan's failure to pay benefits. *Id.*

Turning to the question whether plaintiff's injury was too remote to justify standing, the court resorted to the tort

concept of proximate cause, and stated the proper focus was on (1) the physical and economic nexus between the alleged antitrust violation and harm to plaintiff, and (2) more particularly, the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendants' conduct unlawful and in providing a private remedy under Section 4. 457 U.S. at 478, 102 S.Ct. at 2547. On the question of nexus, Blue Shield argued that because the alleged conspiracy was directed at psychologists rather than subscribers, only the psychologists had standing. The court soundly rejected that notion, concluding plaintiff's injury was not "remote" simply because the goal of the conspirators was directed elsewhere:

> The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators. Here the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market. McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely " 'the type of loss that the claimed violations ... would be likely to cause.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 US, at 489, 50 L Ed 2d 701, 97 S Ct 690 [at 697], quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 US 100, 125, 23 L Ed 2d 129, 89 S Ct 1562 [1577] (1969).

457 U.S. at 479, 102 S.Ct. at 2548 (footnote omitted). The court also rejected Blue Shield's argument the Section 4 remedy was unavailable to plaintiff because she was not an economic actor in the market restrained. "As a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was 'within that area of the economy ... endangered by [that] breakdown of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." 457 U.S. at 480–81, 102 S.Ct. at 2549, *quoting In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973). Concerning the second factor of the remoteness inquiry, the manner in which plaintiff's alleged injury reflected Congress' core concerns in prohibiting this conduct, Blue Shield argued her injury did not reflect any anticompetitive effect of the alleged boycott because she had never faced or paid an increased price for psychotherapy services. That argument was also rejected. The court reaffirmed its statement in *Brunswick* a Section 4 plaintiff need not " 'prove any actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they are actually driven from the market and competition is thereby lessened.' " 457 U.S. at 482, 102 S.Ct. at 2550, *quoting* 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14. The court concluded an increase in price resulting from a dampening of competitive conditions was not to be the sole injury remediable under Section 4. Although plaintiff McCready was not an economic competitor, the court determined her injury was "inextricably intertwined" with the injury the conspirators sought to inflict on psychologists and the psychotherapy market, " 'flow[ing] from that which makes defendants' acts unlawful,' " and falling squarely within the area of congressional concern. 457 U.S. at 484, 102 S.Ct. at 2551, *quoting Brunswick* 429 U.S. at 489, 97 S.Ct. at 697.

◼ One of the most important pronouncements from the Supreme Court on the question of standing under Section 4 is *Associated General Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519,

103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Plaintiff union alleged that in violation of the antitrust laws defendant multiemployer association coerced some of its members and certain third parties to enter business relationships with nonunion firms, which was claimed to have adversely affected the trade of certain unionized forms and thereby the business activities of the union. The issue was whether the complaint sufficiently alleged injury to the union's business or property to give it standing to recover damages under Section 4. *Associated General*, 459 U.S. at 521, 103 S.Ct. at 899. Resorting not to the broad language of Section 4 but to an evaluation of plaintiffs' harm, the alleged wrongdoing by defendants, and the relationship between them, the court concluded the union lacked standing. *Id.* at 535, 545–46, 103 S.Ct. at 907, 912–13. In particular, the court identified six factors to be considered in evaluating standing: (1) the causal connection between the alleged antitrust violation and the harm; (2) improper motive or intent of defendants; (3) whether the claimed injury is one sought to be redressed by antitrust damages; (4) the directness between the injury and the market restraint resulting from the alleged violation; (5) the speculative nature of the damages claimed; and (6) the risk of duplicate recoveries or complex damage apportionment.

■ The causal connection between the violation alleged in that case and the harm to plaintiffs was weak, the court reasoned, because even assuming the coercion directed by defendants at third parties to restrain the trade of certain unionized contractors and subcontractors may have been unlawful, it did not follow that still another party, the union itself, was a "person" thereby injured. *Associated General*, 459 U.S. at 529, 103 S.Ct. at 903. Allegations of improper motive or intent on the part of defendants, though supporting a damage claim under Section 4, are not a panacea shielding a complaint from dismissal. *Id.* at 537, 103 S.Ct. at 908. But in a footnote to the discussion of that factor, important for our present purposes, the court stated a

defendant's specific intent may be relevant to the question of standing.

> [T]here no doubt are cases in which such an allegation would adequately support a plaintiff's claim under § 4. *Cf.* Handler ... (specific intent of defendant to cause injury to a particular class of persons should "ordinarily be dispositive" in creating standing to sue); Lytle & Purdue, ... (suggesting that standing in a group boycott situation should be based on the purpose of the boycott).

*Id.*, n. 35, 103 S.Ct., n. 35, *quoting* Handler, The Shift from Substantive to Procedural Innovations in Antitrust Suits, 71 Colum.L. Rev. 1, 30 (1971); and Lytle & Purdue, Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation, 25 Am.U.L.Rev. 795, 814–16 (1976).

■ The court in *Associated General* next determined the third factor weighed in defendants' favor because the injury claimed by the union was not one sought to be redressed under the antitrust laws. The Sherman Act is designed to assure customers the benefits of price competition, and cases emphasize the central interest in protecting the economic freedom of participants in the market. 459 U.S. at 538, 103 S.Ct. at 908. The union was neither a consumer nor a competitor in the market in which trade was allegedly restrained, and there was a strong inference the union's interests in enhancing its members' earnings would be disserved or harmed by enhanced, uninhibited competition among employers striving to reduce costs. Against its labor background, the union in its capacity as a bargaining representative will frequently not be part of the class the Sherman Act was designed to protect. *Id.* at 539–40, 103 S.Ct. at 909–10. The fourth factor, the directness between the injury and the market restraint, was weak. The court noted defendants' alleged coercion against contracting parties to direct business away from union contractors had insignificant effects on the union because it was neither a participant in the market for construction contracts or subcontracts, nor a direct victim of defendants' coercive prac-

tices. In this context, however, the court expressly reserved decision on whether a direct victim of a boycott who suffers a type of injury unrelated to antitrust policy may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market. *Id.* at 540, n. 44, 103 S.Ct. at 910, n. 44.

The fifth and sixth factors in *Associated General*, the speculative nature of plaintiffs' damages and the risk of duplicative recoveries or complex damage apportionment, were related. The complaint alleged the union suffered unspecified injuries in its business activities, but the court found it obvious such injuries were only the indirect result of whatever harm may have been suffered by certain construction contractors and subcontractors. If either those firms or the direct victims of defendants' coercion had been injured, their injuries would be direct, and under *McCready* they would have the right to maintain their own treble damages actions against defendants.

> The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

459 U.S. at 542, 103 S.Ct. at 910 (footnote omitted). Partly because it was indirect and partly because the effects on the union may have been produced by independent factors, the court found plaintiffs' damage claim highly speculative contrary to the dictates of *McCready*. *Id.* at 542–43, 103 S.Ct. at 910–11. Also flowing from the indirect nature of plaintiff's damages was the need to avoid the risk of duplicate recoveries and the danger of complex apportionment of damages. Were plaintiff permitted to proceed with the complaint, the court noted, the district court would face problems of identifying damages and apportioning them among directly victim-

ized contractors and indirectly affected employees and union entities. It would further be necessary for the court to determine the extent to which coerced firms diverted business from union subcontractors, and then the extent to which the subcontractors absorbed that damage or passed it on to employees by shortening personnel, hours or wages. *Id.* at 545, 103 S.Ct. at 912. All of these problems, inferentially, would be avoided by relying on the more direct victims of defendants' allegedly illegal conduct to seek the Section 4 remedy.

The circuit courts of appeal have not been uniform in fashioning tests of antitrust standing under Section 4 in light of *McCready* and *Associated General*. See generally *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1495 (11th Cir. 1985), *cert. denied* — U.S. ——, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986) (survey of various circuits). The Fifth and Eleventh Circuits continue to employ a "target area" test requiring plaintiff to show he is within that sector of the economy threatened by the breakdown of competition; the court first identifies the area of economy threatened by the alleged anticompetitive conduct, and then determines whether plaintiff's injury is within that target area or if the defendant "aimed" at the plaintiff. *Amey*, 758 F.2d at 1496; *Walker v. U-Haul Company of Mississippi*, 734 F.2d 1068 (5th Cir.1984). A recent decision by the Seventh Circuit employs a *Brunswick* analysis sharing elements of the target area test. *Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197, 1986–1 Trade Cases (CCH) ¶ 67,040 (7th Cir.1986) (distinguishing *Associated General* as dealing with remoteness). The Third and Ninth Circuits have indicated close adherence to the factors identified in *Associated General*. *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3d Cir.1986); *Exhibitors Service, Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574, 1986–1 Trade Cases (CCH) ¶ 67,067 (9th Cir.1986); and *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467 (9th Cir.1985).

It appears the First and Fourth Circuits and our own Tenth Circuit have not addressed the question of Section 4 standing in light of *McCready* and *Associated General.* Little direction is gleaned from *Monfort of Colorado, Inc. v. Cargill, Inc.,* 761 F.2d 570 (10th Cir.1985), *cert. granted* — U.S. ——, 106 S.Ct. 784, 88 L.Ed.2d 763 (1986). The question in *Monfort* involved plaintiff's standing to seek injunctive relief under Section 16. Although the court acknowledged these two Supreme Court opinions it stated the concerns with restricting Section 4 cases, arising in part because of the peculiar risks of unrestrained treble damage claims, are of little consequence in a Section 16 case. 761 F.2d at 574.

■ In *Associated General,* the Supreme Court acknowledged the various tests articulated by the circuit courts but stated "they may lead to contradictory and inconsistent results.... In our view, courts should analyze each situation in light of the factors set forth" in that case. 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33. For that reason and because there is no other authority on the question in this circuit, we will apply the six *Associated General* factors in this case to determine plaintiffs' standing under Section 4. In so doing, we agree with the Ninth Circuit's observations the Supreme Court did not specifically state in *Associated General* a plaintiff must satisfy *all* those factors or any particular one, while recognizing the inquiry whether plaintiff suffered injury of a type the antitrust laws were designed to prevent is a factor of "tremendous significance." *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1470 n. 3 (9th Cir.1985).

Plaintiffs allege HCP will be placed at a substantial competitive disadvantage in, and possibly excluded from, the Sedgwick County health care financing market as a result of BCBSK's termination of Wesley and the particular terms on which BCBSK revised its contracting provider agreements with the three remaining Wichita hospitals. BCBSK argues HCP lacks standing for three reasons. First, HCP has not been excluded from the market; it was under contract with the other three Wichita hospitals at the time of Wesley's termination, and all of those contracts are still in effect with no changes in their terms. Second, HCP's injuries are remote and speculative, involving an "attenuated" relationship between higher costs for HCP which may be passed on to it if Wesley suffers decreasing occupancy rates from the loss of BCBSK subscribers as patients, resulting in higher costs and capitation rates. Third, defendant argues HCP actually stands to benefit from the proposed termination by gaining as new subscribers former BCBSK policyholders who prefer Wesley's hospital services. Plaintiffs respond HCP's injuries will result from difficulties in enrolling providers, and the likelihood of increased costs both from Wesley as a result of the termination, and other Wichita hospitals as a result of the drastic reduction in BCBSK's MAPs. Further, plaintiffs allege HCP and New Century were the direct targets of BCBSK's anticompetitive conduct; the termination of Wesley was undertaken not to harm the hospital but to deter the development of alternate health care delivery systems competing with BCBSK. Finally, they claim there is a serious dispute over whether HCP actually stands to benefit from defendant's conduct by gaining as members former BCBSK subscribers.

■ Even a cursory review of *Associated General* convinces this Court HCP is a proper party. BCBSK undertook the proposed termination of Wesley as a contracting provider because it did not want to do business with competitors. Wesley is not one of BCBSK's competitors; HCP and New Century are. Plaintiffs correctly argue HCP and New Century are the direct targets of defendant's conduct. A detailed application of the *Associated General* factors might well be unnecessary in light of the Supreme Court's statement a defendant's specific intent "to cause injury to a particular class of persons 'should ordinarily be dispositive' in creating standing to sue." 459 U.S. at 537 n. 35, 103 S.Ct. at 908 n. 35 (citations omitted).

But even a detailed analysis of those factors in this case only reinforces the conclusion HCP has standing. The causal connections between the alleged antitrust violations and HCP's harm, and between the market restraint and HCP's injury, are strong. HCP does not occupy the remote status of the union in *Associated General;* rather it is the direct victim of the allegedly unlawful conduct as were the unionized contractors and subcontractors in that case, the participants in the relevant market. The Supreme Court expressly stated that both the coerced parties and direct victims, if injured, would have a right to maintain suit for damages; that was one of the principal reasons the union itself was found to lack standing. 459 U.S. at 541, 103 S.Ct. at 910.

Further, HCP's damages are of the type sought to be redressed by antitrust laws, and in the particular factual context of this case are not sufficiently speculative to warrant the conclusion it lacks standing. Unlike the plaintiffs in *Brunswick* and *Associated General,* when the evidence in this case is taken in its most favorable light, HCP is not seeking damages as a consequence of acts that will unequivocally enhance competition in the market.

▮▮▮▮ Based on the evidence now before the Court, there is a distinct possibility the jury may well conclude that if any party is complaining about increased competition in the market, it is BCBSK itself, not plaintiffs. True, BCBSK argues its conduct will enhance competition by reducing costs to consumers and making available a "new" health care financing package in the form of what it styles as a "preferred provider agreement" with the other three Wichita hospitals. But that conclusion is hotly disputed. Even accepting as true BCBSK's assessment of the evidence (which we do not for purposes of summary judgment), it ignores the facts that in providing this "new" product BCBSK removed from the market its tremendously popular traditional indemnity insurance plan providing coverage for service at all four Wichita hospitals, and abandoned the Choice Care

program in Wichita while Choice Care has been successful and well received elsewhere in Kansas. In addition, whether the "new" product will actually reduce costs to consumers involves no small degree of speculation itself. In the myriad depositions and reams of documents presented, the Court finds no evidence whatsoever BCBSK has guaranteed, or committed itself to, a reduction in subscribers' rates as a result of the discounted MAPs. Finally, HCP argues, not implausibly, that BCBSK's termination of Wesley and entrance into highly favorable contracts with the other Wichita hospitals can only result in higher costs at all the hospitals, which necessarily will be shifted elsewhere in the market in which HCP is a principal purchaser of those services and competitor of BCBSK. An increase in price resulting from a dampening of competitive market forces is "assuredly one type of injury for which Section 4 potentially offers redress." *McCready,* 457 U.S. at 482–83, 102 S.Ct. at 2550, *citing Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Nor may defendant discount plaintiffs' damages claim to the extent overcharges might be passed on to HCP's subscribers. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

▮▮▮▮ Particular attention must be given to defendant's argument HCP's damages, as well as those of New Century and Reazin, are "speculative". The case is presently before the Court in a unique posture because of the parties' voluntary agreement to preserve the status quo, continuing to abide by the terms of the Wesley/BCBSK contracting provider agreement pending the outcome of this suit. The Court perceives the case as primarily a declaratory judgment action which will be tried to the jury to determine whether what is now the proposed termination of Wesley's contract, along with the formation and effect of the revised BCBSK contracting provider agreements with the remaining Wichita hospitals, would violate the antitrust laws if carried out. To that extent all plaintiffs'

claimed injuries and damages are "speculative", but of course BCBSK cannot make any such argument. Consistent with the manner in which this case will be presented to the jury, the Court looks not to the existing situation to determine the merit of plaintiffs' claimed damages, but to their merit if BCBSK were to carry out its allegedly anticompetitive conduct.

Viewed in this light, the evidence is unconvincing HCP's damages are speculative to the degree warranting a determination it lacks standing. The union's injuries in *Associated General* were unspecified, the indirect result of whatever harm might have been suffered by the direct victims of defendants' coercion, and very possibly the result of independent factors. 459 U.S. at 542–43, 103 S.Ct. at 910–11. To the extent HCP's damages are "unspecified", that is largely the result of the parties' voluntary maintenance of the status quo, by reason of which defendant's conduct has not yet had a measurable impact on the market. But the injuries HCP claims it would sustain if the conduct occurred are injuries of a direct victim and not likely the result of independent factors.

The last *Associated General* standing factor is the risk of duplicate recoveries and the danger of complex apportionment of damages. Here also HCP's status as a direct victim of defendant's conduct mitigates these concerns. The Court rejects defendant's argument Wesley's presence in this litigation adequately protects HCP's interests. The antitrust allegations in the complaint are directed not only at the termination of Wesley as a contracting provider, but also against the effects of the modified CAP contracts BCBSK entered into with the other Wichita hospitals. Clearly, those contracts and any anticompetitive effects are directed not against Wesley but against BCBSK's competitors, including HCP. The risk of duplicate recoveries arises from the multifaceted conduct of defendant, and any danger of complex apportionment of damages arises from the separate and distinct injuries claimed, not because there are others in the chain of causation with more persuasive Section 4 claims which could be brought against BCBSK.

■ The Court concludes HCP is a proper party with standing to sue under Section 4. *Associated General* stands for little if not the overriding principle it is the direct victims of anticompetitive conduct which should be relied on to press their Section 4 claims with vigor. HCP is such a party.

New Century contends it will also be placed at a competitive disadvantage and possibly excluded from the Sedgwick County health care financing market as a result of defendant's conduct. But New Century has not, and currently is not, selling its insurance products in this market, although expecting regulatory approval at any time. Defendant insists this fact alone warrants denial of standing because New Century cannot plausibly argue it has been precluded from the market by reason of BCBSK's conduct. Plaintiffs respond with case authority holding a competitor need not be engaged in an ongoing business to have standing, that it is sufficient if the competitor manifests his intent to enter the market and preparedness to do so, as has New Century.

■ The Court concludes the *Associated General* factors weigh heavily against granting New Century standing. The causal connections between the alleged antitrust violations and New Century's harm, and between its injury and the market restraint, are severely weakened by the fact New Century is merely a prospective competitor. But even assuming it will suffer an "antitrust injury" sufficient to otherwise warrant standing (it, as HCP, would certainly be a direct victim of defendant's conduct), the risk of duplicate recoveries and the danger of complex damage apportionment are to the degree justifying denying New Century Section 4 standing. New Century has no existing business relations with Wesley. If and when New Century receives regulatory approval to sell its insurance products in Kansas, those products will be marketed not by New Century itself

but by HCP. Although it will possess separate products, for standing purposes New Century's position is fairly indistinguishable from that of HCP. To allow both to proceed to the jury with their antitrust claims runs the risk of permitting duplicate recovery from BCBSK for what is singular conduct as against its competing insurance carriers. Further, the jury would be required to determine to what extent HCP absorbed its damages, passed the losses on to its own products, passed it on to New Century products, or passed it on in combination, and then the extent to which New Century was damaged. Under these circumstances the Court concludes that between New Century and HCP, the latter is certainly the more direct victim, and in the interest of keeping what is already a highly complex antitrust action manageable for both the Court and the jury, HCP's presence and standing will adequately protect New Century's interests and remedy any violations thereof.

Plaintiff Reazin's sole connection with this case, defendant argues, is that he is on the medical staff of Wesley. In his deposition Dr. Reazin testified BCBSK's termination of Wesley might force him to join other hospital staffs if his BCBSK patients sought treatment there, that he would be forced into additional time and expense to satisfy those patients' needs, and that the termination might have a disadvantageous impact on his resources remaining at Wesley. (Reazin Depo., p. 16.) Defendant also argues Reazin lacks standing in part because neither he, nor Sedgwick County doctors in general, were the target of defendant's conduct.

■ The Court agrees Reazin lacks Section 4 standing. Even assuming his injuries are "antitrust" in nature, the chains of causation between his injuries, and the alleged violations and the market restraint, are sufficiently attenuated to warrant the conclusion he is not a proper party. Reminiscent of the union's arguments in *Associated General*, Reazin argues he will be injured *if* BCBSK policyholders, themselves indirect victims of defendant's conduct, demand he treat them at other hospitals, and *if* the injuries suffered by Wesley, a direct victim, translate into staff and equipment reductions. *Associated General* expressed an overwhelming preference for permitting the direct victims of antitrust violations to sue, rather than persons in the remote status of Reazin. Finally, and for the same reasons, allowing Reazin to present his claims to. the jury would entail a high risk of duplicate recoveries and a danger of extremely complex apportionment of damages.

Reazin's status as a BCBSK subscriber provides him no solace under the facts of this case. Unlike the plaintiff in *Blue Shield of Virginia v. McCready*, whose damages could be calculated "to the penny," Reazin does not claim to have already suffered direct, personal financial loss as a consequence of defendant's conduct.

Defendant BCBSK is granted summary judgment on the Section 4 claims of New Century and Dr. Reazin. The direct victims of defendant's conduct, Wesley and HCP, are present in this lawsuit vindicating the public interest in antitrust enforcement. Denying New Century and Reazin remedies on the basis of their allegations will not leave significant antitrust violations undetected or unremedied.

### Section 16 of the Clayton Act

■ Section 16 of the Clayton Act, permitting injunctive relief, involves traditional principles of equity. The remedy "is flexible and capable of wise 'adjustment and reconciliation between the public interest and private needs....'" *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (citation omitted).

■ The Tenth Circuit detailed the requirements for standing under Section 16 in *Monfort of Colorado, Inc. v. Cargill, Inc.*, 761 F.2d 570 (10th Cir.1985), *cert. granted* — U.S. —, 106 S.Ct. 784, 88 L.Ed.2d 763 (1986). Section 4 suits may be brought only by persons who are injured by the allegedly unlawful conduct, but in

Section 16 injunction cases courts do not require proof of actual injury because they need not calculate damages. *Monfort*, 761 F.2d at 573. Plaintiffs in a Section 16 case need only prove a causal connection between their threatened injuries and the putative antitrust violations; once they surmount the causation hurdle they have standing to seek an injunction. *Id.* at 574, *citing Brunswick*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Relying on *McCready* and *Associated General*, the court stated the causation inquiry is similar to a proximate cause analysis under tort law; the question is whether the alleged antitrust violation and its consequences are a proximate cause of plaintiff's threatened injury. *Id.* Plaintiff Monfort, a direct horizontal competitor of defendants, relied on the theory defendant's proposed acquisition of another competitor would enable defendant to engage in predatory pricing for a period of time, driving others out of the market, after which defendant would then be able to charge monopoly prices. *Id.* at 575. The court declined to embrace defendant's theory predatory pricing "is just true competition," noting courts continue to find predatory pricing, when proved, violates the antitrust laws. *Id.* It found that even though there remained a question whether the harm would arise (i.e., defendant's success in the undertaking), plaintiff presented a plausible theory of how it would be injured by the putative violation, a theory of injury logically related to the harm caused by an increased concentration of economic power in defendant. Concluding "the causal connection will exist if the ultimate injury materializes," the court held plaintiff had Section 16 standing. *Id.* at 576–77.

 There is no challenge to Wesley's standing under Sections 4 and 16. We have concluded HCP possesses standing under Section 4; *a fortiori*, HCP has standing under Section 16. The question is whether New Century and Reazin, found to lack standing under Section 4, nevertheless have standing under Section 16. Plaintiffs who lack standing to seek damages may nevertheless have sufficient standing to

seek injunctive relief. *Brunswick*, 429 U.S. at 491, 97 S.Ct. at 698; *Monfort*, 761 F.2d at 573.

 New Century is a direct horizontal competitor of defendant BCBSK, as is HCP. Both HCP and New Century are the direct and intended victims of the putative antitrust violations by defendant. The Court is satisfied that if the ultimate injuries to these plaintiffs materialize, including the shifting of costs by other hospitals and the exclusion from the health care financing market, there will be a causal connection between these antitrust injuries and the alleged antitrust violations. New Century was determined to lack Section 4 standing principally because of the risk of duplicate recoveries and the danger of complex apportionment of damages, neither of which have any consequence in the question of standing under Section 16. Nor is the fact New Century has yet to enter the relevant market significant. Section 16 does not require actual injury and therefore does not foreclose antitrust claims for which the injury is yet to occur. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 359 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Monfort*, 761 F.2d at 573. The Court concludes New Century has standing under Section 16.

 In his professional capacity Dr. Reazin cannot surmount the causation hurdle. His injuries of additional time and expense may occur only if BCBSK subscribers, the indirect victims of the putative antitrust violations, demand he provide service to them at hospitals other than Wesley. The possible impact on his resources remaining at Wesley may occur only if Wesley, a direct victim, first suffers losses and then passes them along as reductions in staff and/or facilities. But in his personal capacity as a BCBSK subscriber, Reazin may be injured in the form of liability for excess costs at Wesley if the alleged antitrust violations occur. If this ultimate injury materializes, there will be the same causal connection between the injury and the antitrust violations that existed in

*McCready.* The Court concludes Reazin has standing under Section 16 to seek injunctive relief against that possibility.

Defendant BCBSK is denied summary judgment on the Section 16 injunctive relief claims of plaintiffs HCP, New Century and Reazin.

## PLAINTIFFS' FEDERAL ANTITRUST CLAIMS

### *Section 1 of the Sherman Act.*

Section 1 of the Sherman Act prohibits "every contract, combination ..., or conspiracy, in restraint of trade...." Plaintiffs claim in Counts I–III of their complaint defendant BCBSK has violated Section 1 by restraining trade in unlawfully terminating the contract with, and refusing to deal with, Wesley; it has contracted, combined or conspired with the other Wichita hospitals to boycott HCP; and it has contracted, combined or conspired with those same hospitals to refrain from competing with BCBSK in the health care financing market. Defendant seeks summary judgment on these claims, arguing first the termination of Wesley's contract was a unilateral decision by defendant not undertaken in agreement with others, and therefore no violation of Section 1. Alternatively, BCBSK argues that even if there is found to be an agreement, its conduct and the consequences of the agreement are neither a per se antitrust violation nor a violation under the rule of reason.

Summary judgment may not be granted when a genuine issue of material fact is presented to the trial court. The evidence must be received in the light most favorable to the party against whom the judgment is sought, and factual inferences tending to show triable issues must be resolved in favor of the existence of those issues. Generally, summary judgment should be used sparingly in antitrust litigation. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Instructional Systems Development Corp. v. Aetna Casualty & Surety Co.,* 787 F.2d 1395, 1400 (10th Cir. 1986). This is particularly true in cases of novel antitrust claims. *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Ratino v. Medical Service of Dist. of Columbia,* 718 F.2d 1260 (4th Cir.1983).

### Agreement

■ Section 1 of the Sherman Act does not proscribe independent action. Thus a manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, so long as it does so independently. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). However, the high value placed on the right to refuse to deal with others does not mean that right is unqualified. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. ——, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In *Aspen Skiing,* plaintiff was allowed to recover under both Sections 1 and 2 of the Sherman Act for a monopolist's unilateral decision to terminate a joint product where the decision was designed to make an important change in the character of the market, 105 S.Ct. at 2857, 86 L.Ed.2d at 481.

■ To create a jury issue on whether a defendant was party to an agreement or conspiracy prohibited by the antitrust laws, plaintiffs must produce evidence tending to prove defendant and other parties had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Black Gold, Ltd. v. Rockwool Industries, Inc.,* 732 F.2d 779 (10th Cir.1984), *cert. denied* —— U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984), *citing Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470. But the *Monsanto* requirement indicates no retreat from cases holding that a combination occurs between a seller and buyers whose acquiescence in the seller's firmly enforced restraints was induced by the communicated danger of termination. *Black Gold, id.* at 780, *citing Perma Life Mufflers v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). An insurer such as defendant may

make a unilateral decision of the standard terms on which it will deal, and where that decision is not accompanied by a showing of concerted action or abuse of monopoly power, there is no violation of Section 1. *Glen Eden Hosp. v. Blue Cross & Blue Shield of Michigan,* 740 F.2d 423 (6th Cir. 1984).

Plaintiffs' evidence shows no less than 27 meetings between BCBSK and St. Joseph and St. Francis hospitals, Wesley's primary competitors, prior to BCBSK's announced termination of Wesley as a contracting provider on August 29, 1985. Defendant contends the majority of those meetings concerned only the possible joint venture between the hospitals and BCBSK on the Kansas Health Plan HMO.

The deposition testimony of Marlon Dauner, BCBSK's Senior Vice President for External Affairs, was that the Steering Committee decided on August 12, 1985, *to recommend* to the Executive Committee of the Board of Directors that Wesley's contracting provider agreement be terminated at the end of the year. The committee decided at that same meeting to seek a reduction in the maximum allowable payments in the contracting provider agreements with the other Wichita hospitals. At a meeting the following day, August 13, between representatives of BCBSK, St. Joseph and St. Francis, Dauner specifically informed them the Steering Committee was going to recommend Wesley's termination. If implemented, he said, BCBSK would have a different insurance product in the Sedgwick County market, and was seeking the hospitals' acceptance of reduced MAPs for calendar year 1986. He told them he anticipated a discount of 15–20% was the amount necessary to secure a competitively priced product. By his own admission the hospitals were "concerned" about the reduced MAPs and asked what effect Wesley's termination would have on their patient volume. Dauner responded "we have no *guarantee* that there would be any shift in patient volume" benefiting those hospitals at the expense of Wesley. Negotiations on the reduced MAPs continued throughout August and September, 1985.

Prior to the decision to recommend the BCBSK Executive Committee terminate Wesley, in July defendant had sent to all contracting providers in Wichita, including Wesley, a proposed contract for calendar year 1986 contemplating a 4% *increase* in MAPs.

Although St. Joseph and St. Francis may not have agreed to the reduced MAPs by August 29, 1985, when the Executive Committee voted to terminate Wesley, neither had they unequivocably rejected them. It is clear from the record the Executive Committee was, at the time of its decision, aware of the ongoing negotiations and that the proposed reduction of MAPs was under consideration by the hospitals.

Evidence indicates the hospitals' concern about the 20% reduction in MAPs was that BCBSK would be compensating them, at best, for simply their actual costs in providing services; they hoped to make up the difference by serving an increased volume of BCBSK subscribers. St. Joseph and St. Francis agreed to the reduced MAPs in September, 1985. The fact St. Joseph, with the tacit support of St. Francis, sought to delay implementation of the reduced MAPs following the litigants' voluntary agreement to continue abiding by the Wesley CAP contract is not without significance.

 BCBSK argues there is no evidence the agreement with those hospitals depended on defendant's termination of Wesley. But intent to conspire can be created by circumstantial evidence. The evidence defendant began its MAP negotiations with St. Francis and St. Joseph by announcing what was at that point the Steering Committee's mere *proposal* to terminate Wesley, the evidence those hospitals acquiesced in the reduced MAPs counting on a shift of patients (whether or not "guaranteed" by BCBSK), and the evidence certain members of the Executive Committee knew *for a fact* the hospitals would be "willing to accept a discount of some degree" when the Committee voted to terminate Wesley, creates a sufficient, if not significant, inference of unity of purpose,

or common design and understanding, or meeting of the minds in an unlawful arrangement. Resolving this, and other inferences permissible from the evidence, in plaintiffs' favor, the Court declines to find the decision to terminate Wesley was purely unilateral on the part of BCBSK.

### Per Se vs. Rule of Reason Analyses

 Under the doctrine of per se illegality certain agreements or practices, because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed unreasonable and therefore illegal under Section 1 of the Sherman Act, without elaborate inquiry into the precise harms they cause or the business reasons for their use. *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). By contrast, under the rule of reason the Section 1 reference to "restraint of trade" includes only acts, contracts, agreements or combinations which prejudice public interest by unduly restricting competition or unduly obstructing the course of trade, or which injuriously restrain trade because of their inherent nature or effect or because of their evident purpose. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911). But per se rules are much looser in their condemnation than is often supposed; the rule of reason can be much more severe than is commonly assumed; and the categorization does not determine, and often obscures, what should be alleged, proved, or submitted to the jury. P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues, pp. 25, 27 (Fed.Judicial Ctr.1981).

 Exactly what types of cases fall within the per se category is far from certain. The Supreme Court has stated that "judicial inexperience with a particular [market] arrangement counsels against extending the reach of the per se rules...." *N.C.A.A. v. Bd. of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). But the duration and depth of judicial experience with the health care industry is sufficient to permit application of the per se rule to particular devices, such as price fixing, division of markets, group boycotts and tying arrangements, the anticompetitive effects of which have been long recognized. *Wilk v. AMA*, 719 F.2d 207 (7th Cir.1983), *cert. denied* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984).

In its summary judgment motion defendant BCBSK argues there are no per se antitrust violations because there is neither evidence of price fixing nor a boycott. Defendant makes much of the fact that any agreement found in this case is vertical. But "[w]hether horizontal or vertical, the question is always one of competitive effects and redeeming virtues. The horizontal—vertical distinction is relevant only insofar as it bears on the assessment of competitive evils or justifications." Areeda, The "Rule of Reason," at 17.

Plaintiffs make no claim of price fixing in this case, and defendant argues none could possibly be made, relying on *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir.1984), *cert. denied* — U.S. —, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985). *Kartell* held Blue Shield's ban on balance billing, prohibiting doctors from making additional charges to Blue Cross subscribers, violated neither Section 1 nor Section 2 of the Sherman Act.

We disagree with the district court's finding of "restraint." To find an unlawful restraint, one would have to look at Blue Shield as if it were a "third force," intervening in the marketplace in a manner that prevents willing buyers and sellers from independently coming together to strike price/quality bargains. Antitrust law typically frowns upon behavior that impedes the striking of such independent bargains. The persuasive power of the district court's analysis disappears, however, once one looks at Blue Shield, not as an inhibitory "third force," but as itself the purchaser of the doctors' services. See *Group Life & Health In-*

*surance Co. v. Royal Drug Co.*, 440 U.S. 205, 214, 99 S.Ct. 1067, 1075, 59 L.Ed.2d 261 (1979) (direct reimbursement to participating pharmacies for subscribers' drugs "merely [an] arrangement[ ] for the purchase of goods and services by Blue Shield"). Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold. Thus, the more closely Blue Shield's activities resemble, in essence, those of a purchaser, the less likely that they are unlawful. 749 F.2d at 924–25.

We note with interest the Supreme Court's observation in *Royal Drug Co.*, a case relied on by the *Kartell* court:

> [E]xempting provider agreements from the antitrust laws would be likely in at least some cases to have serious anticompetitive consequences. Recent studies have concluded that physicians and other health-care providers typically dominate the boards of directors of Blue Shield plans. Thus, there is little incentive on the part of Blue Shield to minimize costs, since it is in the interest of the providers to set fee schedules at the highest possible level. This domination of Blue Shield by providers is said to have resulted in rapid escalation of health-care costs to the detriment of consumers generally. See Skyrocketing Health Care Costs: The Role of Blue Shield, Hearings before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 95th Cong. 2d Sess. 4–34 (1978) (remarks of Michael Pertschuk, Chairman, Federal Trade Commission).

440 U.S. at 232 n. 40, 99 S.Ct. at 1084 n. 40.

■ *Kartell*'s recognition of Blue Shield as a "customer" purchasing services from providers is not new. But that principle has not precluded findings of per se price fixing violations by BCBS plans in other cases involving different facts. *See Glen Eden Hospital v. BCBS of Michigan*, 740 F.2d 423. (6th Cir.1984) (if plaintiff for-profit hospital establishes collaboration between participating hospitals and BCBS on decisions to terminate plaintiff's contract, and setting more restrictive reimbursement levels for plaintiff, subject to a per se analysis); and *St. Bernard General Hospital v. Hosp. Service Ass'n*, 712 F2d 978 (5th Cir.1983), *cert. denied* 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984) (plaintiff established a prima facie showing of a per se price fixing violation by Blue Cross). This issue need not be pursued further because plaintiffs in this case have not claimed an illegal price-fixing arrangement by BCBSK. We do, however, emphatically reject defendant's argument such claims can never lie against a BCBS plan merely because of the role it plays in the health care market.

■ Count I of the complaint in this case alleges in part BCBSK's refusal to deal with Wesley. Cases in which the Supreme Court has applied the per se approach generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle. *Northwest Stationers v. Pacific Stationery*, 472 U.S. ——, ——, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202, 211 (1985). A concerted refusal to deal may merit per se treatment. *Northwest Stationers*, 105 S.Ct. at 2620, 86 L.Ed.2d at 212.

In *St. Bernard General Hosp. v. Hosp. Service Ass'n*, 712 F.2d 978 (5th Cir.1983), *cert. denied* 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984), the court held plaintiff for-profit hospital had shown the prima facie effects of antitrust behavior in defendant Blue Cross' refusal to deal with the hospital.

> Whether a refusal to deal is a per se violation of the Sherman Act or subject to the rule of reason is not always a simple inquiry. Some cases claim that concerted refusals to deal always fall under the per se category. *E.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, [359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)]. Other cases, however, clarify the legal analysis and teach that certain

factors must be present for a per se analysis to apply. There must be an anticompetitive motive behind the primary purpose of the agreement. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). There must be a commercial purpose to the agreement, rather than, for example, an attempt at industry self-regulation. *United States v. United States Trotting Assn.*, 1960 Trade Cases (CCH) ¶ 69,761 (S.D. Ohio 1960). *See also United States v. Insurance Board of Cleveland*, 144 F.Supp. 684 (N.D.Ohio 1956) (rules of county association of independent insurance agents subject to rule of reason under group boycott charges). The per se category also requires coercive economic pressure. *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra; United States v. New Orleans Insurance Exchange*, 148 F.Supp. 915 (E.D.La.) (J. Skelly Wright, J.), *aff'd* 355 U.S. 22, 78 S.Ct. 96, 2 L.Ed.2d 66 (1957) (per curiam).

*St. Bernard*, 712 F.2d at 987–88. The court determined there need not be "hard evidence" of anticompetitive motive for a refusal to deal to merit per se treatment; "the law does not require a 'smoking gun' to prove concerted antitrust activity." *Id.*, at 988. Noting it was clear there was competition between plaintiff and the other hospitals contracting with BCBS, the court concluded:

> As to the district court's holding that any refusal to deal equally was reasonable, we notice that the prima facie effects of antitrust behavior have been shown. The only readily-apparent escape would be an affirmative defense that the restrictions were reasonable, or were the least restrictive methods to achieve a legitimate business goal. We cannot make such a finding until the defendant presents its case. *Even that evidence, were it to be presented, would of course not counter a per se violation.*

*Id.* (emphasis added).

▮ The vertical agreements undertaken by BCBSK with the other Wichita hospitals in this case mirror those found in *St. Bernard*. These agreements were not attempts at industry self-regulation; indeed, consistent with defendant's repeated characterization of its role as a "customer" in the market, the agreements were clearly commercial in nature. Even though the Court need not find a " 'smoking gun' " to prove concerted antitrust activity, there is in this case evidence of anticompetitive motive in the termination of, and refusal to deal with, Wesley. When the BCBS Executive Committee met on August 29 to consider action against Wesley, the question they voted on was *not* "how can we continue to serve our cost containment function in light of the developments in the Wichita market?" Significantly, the question posed was "do we want to continue to do business with our *competitors?*" There is evidence the committee voted "no" to that question knowing its action would hurt *both* Wesley and BCBSK itself, at least for the short term. There is also evidence of coercive economic pressure by BCBSK, not only from the *in terrorem* effect of the termination on other hospitals, but as well from defendant's express statements in an open letter to the members of the Kansas Hospital Association, dated October 4, 1985, from BCBSK's president, Wayne Johnston:

> Regarding our future relationship with Kansas hospitals, I would emphasize that we wish to continue our long and satisfactory relationship with each hospital. We do believe that to properly serve our subscribers, we must make available highly desirable health benefit products at reasonable and competitive prices. We cannot stand idly by and watch insurance-hospital corporations, such as HCA, monopolize the delivery and financing of care by seeking to enroll Blue Cross and Blue Shield subscribers in their insurance programs. Vertical integration is a strategy some hospitals may feel to be in their best interest. *However, if hospitals decide to compete with Blue Cross and Blue Shield in the manner that HCA is competing, Blue Cross and*

*Blue Shield must make a business decision about its future relationship with these entities. Hospitals that wish to continue their current relationship with Blue Cross and Blue Shield, that abide by the terms of our hospital agreement, that do not seek to enroll subscribers in other programs, and that wish to cooperate with Blue Cross and Blue Shield as a major marketing arm of the hospital, will experience no change in the contractual relationship that has historically served Kansans well.*

(Emphasis added.) Even more pointedly, Marlon Dauner testified at deposition: "If [St. Joseph and St. Francis] accepted the [reduced] maximums, they would continue to be contracting hospitals with Blue Cross and Blue Shield and the benefits that go along with that." (Dauner Depo., pp. 157–58.)

This evidence alone establishes the prima facie effects of antitrust behavior, and under *St. Bernard* and the authorities that case relies on, very possibly a per se violation of Section 1.

BCBSK next argues Wesley's termination does not support plaintiffs' boycott allegations in Count II under a per se analysis. Defendant argues, first, there can be no per se boycott violation in this case because such a violation requires concerted attempts by a group of competitors at *one* level to protect themselves from competition. Here, by contrast, defendant points to the fact any agreement to be found in the evidence is of a *vertical* nature, between BCBSK as a customer and the other Wichita hospitals as suppliers. Second, defendant argues, even if there is evidence of a boycott, its legality must be tested under the rule of reason rather than a per se analysis.

In *Northwest Stationers v. Pacific Stationery,* the Supreme Court stated boycott cases to which the per se analysis properly applies are those in which

> ... the boycott ... cuts off access to a supply, facility, or market necessary to enable the boycotted firm to compete,

... and frequently the boycotting firms possess[ ] a dominant position in the relevant market.... In addition, the practices [are] generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing precompetitive effects is remote.

105 S.Ct. at 2619, 86 L.Ed.2d at 211 (citations omitted).

*Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432 (10th Cir.1983), *cert. denied* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172, answers most of defendant's arguments in this case. *Olsen* involved a Section 1 claim against a product distributor. Among the allegations was that defendant engaged in a group boycott of plaintiff retailer, in combination with the product manufacturers; a vertical arrangement, as is present in this case. Defendant Progressive argued, as does BCBSK here, that the group boycott should not be treated as a per se violation because it was " 'at least potentially reasonably ancillary to joint, efficiency creating economic activities.' " *Id.* at 438, *quoting U.S. v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1357 (5th Cir.1980). The Tenth Circuit rejected that argument.

In this case there is evidence that there was a boycott which was "clearly exclusionary or coercive in nature." *Gould v. Control Laser Corp.,* 462 F.Supp. 685, 691 (M.D.Fla.1978), *aff'd,* 650 F.2d 617 ( [5th Cir.]1981). Thus, the case differs from those in which "courts have circumvented the rigidity of the *per se* rule by reasoning that the need for its application 'depends not upon a finding that * * * [a restraint] constitutes a "boycott" but upon an analysis of its purpose and competitive impact.' " Note, The Facial Unreasonableness Theory: Filling the Void Between Per Se and Rule of Reason, 55 St. John's L.Rev. 729, 750 n. 155 (1981) (quoting *Gould, supra,* at 691). Procompetitive impacts or motives within the trial court's findings are

difficult to see. For instance, Herger [the distributor] boycotted Olsen because "she had an independent prejudice against giving competitive dealers large discounts." In addition, Progressive harbored a "predatory intent toward competing dealers."

From the findings it would appear that the boycott engaged in by Progressive was *per se* violative of the antitrust laws. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (*per se* violation of Sherman Act exists when department store conspires with appliance manufacturers and distributors to prevent sales to small retail appliance stores).

703 F.2d at 438–39.

In *Wilk v. AMA,* 719 F.2d 207 (7th Cir. 1983), *cert. denied* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984), among the plaintiff chiropractors' allegations under Section 1 was that defendant engaged in a group boycott by agreeing to induce individual doctors to forego any associations with the chiropractors, in the interests of quality patient care. The court said:

On the theoretical side, the "boycott" which plaintiffs alleged and undertook to prove is surely not within any of the more familiar contexts. However, "[b]oycotts are not a unitary phenomenon." P. Areeda, *Antitrust Analysis* 381 (2d ed. 1974). "In its simplest aspects, a boycott ... is nothing more than an agreement among a number of economic actors to sever or limit economic relations with another economic actor or actors." Bird, *Sherman Act Limitations on Non-commercial Concerted Refusals to Deal,* 1970 Duke L.J. 247, 248.

Here, the jury was free to find that the services of one medical doctor were interchangeable with the services of other medical doctors; they competed with one another. The services of one chiropractor were interchangeable with the services of other chiropractors; they competed with one another. The services of a relatively small number of medical doctors were interchangeable with the services of all or nearly all chiropractors; they competed with one another. *Superficially at least, the benefits to consumers arising from unrestrained competition could have been realized without any cooperation between any two medical doctors, between any two chiropractors, between any medical doctor and any chiropractor, or between an enclave of medical doctors and an enclave of chiropractors.*

\* \* \* \* \* \*

What the antitrust law implications of all this may be for consumers of health care services, as distinguished from chiropractors as a group of health care providers, is difficult to discern.

\* \* \* \* \* \*

It can fairly be said that the Supreme Court of the United States has been persistent and firm in its support of the *per se* doctrine. Since the trial of the case before us, the Court has pointedly described and endorsed its virtues. *Arizona v. Maricopa County Medical Soc.,* 457 U.S. [332] at 342–348, 102 S.Ct. [2466] at 2472–2475 [73 L.Ed.2d 48 (1982) ]. Also, it is now firmly established that the members of learned professions and their professional associations are within the terms of Section 1 of the Sherman Act. *Id.* at 348–349, 102 S.Ct. at 2475–2476; *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Nor are the duration and depth of the judiciary's experience with the health care industry too little to permit application of the *per se* rule to a particular device, such as price-fixing, the anti-competitive effects of which have long been recognized. *Arizona v. Maricopa County Medical Soc.,* 457 U.S. at 439–351, 102 S.Ct. at 2476–2477. Moreover, as recently as in *Arizona v. Maricopa County Medical Soc.,* a price-fixing case, the Court quoted approvingly this language from *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "Among the practices which the courts

have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." 457 U.S. at 344, n. 15, 102 S.Ct. at 2473 n. 15.

*Id.* at 218, 221 (emphasis added). The court noted that even a generalized public interest motive dominating the arrangement would not save it from a per se violation label if the conduct was such that label would otherwise clearly attach. *Id.* at 220–21. Nevertheless, the court concluded that on the particular facts of that case the per se rule would not apply to defendants' conduct first because of the patient care motive, and more importantly, because the coercion in the boycott alleged was *not* used "to compel either medical doctors or chiropractors to engage in certain economic behavior ... [but] to engage in the boycott itself, and not to exert, through the boycott, compulsion on anyone to do or refrain from doing anything else." *Id.* at 221.

There is no doubt BCBSK plays a significant, if not dominant, role in the Kansas health care industry. In sharp contrast to the boycott in *Wilk*, the group boycott alleged in this case is not *among* members of the medical profession with bona fide concerns for patient care, but a boycott between an insurance company *with* members of that profession. *Olsen* held that vertical arrangements such as this are no less subject to per se treatment than horizontal arrangements. There is evidence BCBSK's agreements with St. Joseph, St. Francis and Riverside hospitals will reduce or eliminate access to those hospitals by HCP and other alternative delivery systems attempting to compete with BCBSK on equal terms. The boycott alleged is both exclusionary and economically coercive. Enhanced market efficiencies, or procompetitive impacts and motives are difficult to discern. At no time did BCBSK claim it acted out of concern for the *quality* of patient care, one of the primary reasons the *Wilk* boycott was afforded treatment under the rule of reason. After BCBSK acted purely for "competitive" reasons, it argued to the public, and now this

Court, its conduct was undertaken to ensure *low cost* medicare care. There is a significant question whether that was the true motive underlying defendant's conduct. But even assuming so, there is little if any indication from the evidence this "generalized public interest" necessitated defendant's actions. Low cost medical care benefiting consumers in the same manner might well have arisen from unrestrained competition, without the necessity of defendant's exclusionary and coercive conduct.

■■■ The Court concludes there is evidence in the record from which the jury could properly find conduct in the form of a concerted refusal to deal, and/or a group boycott, constituting per se violations of Section 1.

■■■ Defendant next argues its conduct is lawful under the rule of reason. The classic articulation of the rule of reason appears in *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

The inquiry mandated by the rule of reason is whether the challenged agreement is one that promotes competition or one that suppresses competition. *National Society of*

*Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

 It is the factfinder's responsibility to accept or reject a claim of per se antitrust violations. *Instructional Systems Development Corp. v. Aetna,* 787 F.2d 1395, 1401 (10th Cir.1986). Given evidence from which a jury may find conduct constituting a per se violation, the jury may be instructed to decide whether a per se antitrust violation has in fact occurred, or if not, to then apply the rule of reason to plaintiffs' Section 1 claims. *Wilk v. AMA,* 719 F.2d 207, 219 (7th Cir.1983). In this case there is evidence and inferences from which the jury, as factfinder, can conclude per se violations occurred, and there is no reason for the Court at this stage to address the merits of plaintiffs' Section 1 claims under the rule of reason. The *Wilk* approach seems proper, and this case will go to the jury with alternate instructions on the per se and rule of reason analyses.

Defendant's motion for summary judgment on plaintiffs' Section 1 claims is denied.

### Section 2 of the Sherman Act

Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize, and combinations or conspiracies with other persons to monopolize any part of trade or commerce. Count IV of the complaint claims monopolization by BCBS; Count V claims an attempt to monopolize by BCBS; and Count VI claims defendant engaged in one or more conspiracies to monopolize.

### Monopoly

 " 'The offense of monopoly under § 2 ... has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.' " *Aetna,* at 1403 (10th Cir.1986), *citing U.S. v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Monopoly power is defined as the power to control

prices in the relevant market and exclude competition. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies,* 783 F.2d 159 (10th Cir.1986).

There is in this case much dispute over the size of the market share possessed by BCBSK. Its president, Wayne Johnston, and senior vice president, Marlon Dauner, testified in depositions that BCBSK holds insurance contracts with 37% of the Kansas population, though in its briefs defendant contends it is only 35%. Plaintiffs have evidence defendant accounts for 61% of earned health insurance premiums; defendant responds that is not the relevant market. The first problem with even the 37% figure is that represents the portion of the *total* Kansas population insured by BCBSK; it does not represent the percentage of defendant's market share among the portion of Kansas citizens who actually carry any health insurance, removing from consideration those who are self-insured. BCBSK responds such a figure is unavailable. But the Court notes that in other cases involving BC or BS plans, that relevant figure *has* been available and it has, logically, been higher than the percentage of the total population. *See Kartell v. Blue Shield,* 749 F.2d 922, 924 (1st Cir. 1984) (BS provides insurance to *56%* of Massachusetts population, but figure rises to *74%* after subtracting from total population those relying on government sponsored health care (Medicare, Medicaid)); *see also Ratino v. Medical Service of Dist. of Columbia,* 718 F.2d 1260, 1264 (4th Cir. 1983) (Blue Shield enrolls approximately 1.4 million D.C. residents in insurance plans; *80%* of all individuals *covered by health care insurance* in the area). The Court is comfortable assuming BCBSK's share of the *relevant* market is higher than 37%.

At oral argument defense counsel argued that even the 61% figure is insufficient to support plaintiffs' Section 2 monopolization claim, relying on *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325 (7th Cir.1986). In that case the court found BCBS of Indiana

lacked market power sufficient to support a monopolization claim.

The district court found that each of the actors suggesting that market share does not imply market power is present in the market for medical insurance. New firms may enter easily. Existing firms may expand their sales quickly; the district court pointed out that insurers need only a license and capital, and that firms such as Aetna and Prudential have both. There are no barriers to entry—other firms may duplicate the Blues' product at the same cost the Blues incur in furnishing their coverage. See George J. Stigler, *The Organization of Industry* 67–70 (1968) (defining barriers to entry as differentials in the long-term costs of production); cf. Harold Demsetz, *Barriers to Entry*, 72 Am.Econ.Rev. 47 (1982) (showing that not all barriers, as so defined, injure effective competition). The Blues and other nonprofits may have an edge because of the lower tax Indiana places on premiums paid to them, but this sort of advantage is not pertinent here. Other mutual insurance carriers (including Prudential) can get the same tax break. A PPO plan does not exploit the tax advantage as compared with any other plan the Blues could offer. The tax benefits may or may not be desirable as a matter of state policy, but this is no concern of antitrust law.

The Blues do not own any assets that block or delay entry. The insurance industry is not like the steel industry, in which a firm must take years to build a costly plant before having anything to sell. The "productive asset" of the insurance business is money, which may be supplied on a moment's notice, plus the ability to spread risk, which many firms possess and which has no geographic boundary. Cf. *Hood v. Tenneco Texas Life Insurance Co.*, 739 F.2d 1012, 1019 (5th Cir.1984) (insurance industry marked by ease of entry); *Alabama Association of Insurance Agents v. Board of Governors*, 533 F.2d 224, 250–51 (5th Cir.1976) (financial services in general are competitive because of the ease of moving mon-

ey), modified, 558 F.2d 729 (1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). The district court emphasized that every firm can expand its sales quickly if the price is right, that no firm has captive customers, and that many firms want to serve this market. The conclusion that the Blues face vigorous and effective competition is not clearly erroneous. See also *National Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 604–05 (11th Cir.1986) (defining a market of "all payment devices" on basis of a conclusion that one financial service is a ready substitute for another).

Still, the Hospitals say, the conclusion is legally irrelevant. Ease of entry and the absence of barriers do not matter if the defendant has a large market share. The Hospitals are wrong. Market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the court should use them. See [*United States v.*] *Waste Management*, [743 F.2d 976 (2nd Cir. 1984)], *supra.* Market share reflects current sales, but today's sales do not always indicate power over sales and price tomorrow....

\* \* \* \* \* \*

The inquiry in each case is the ability to control output and prices, an ability that depends largely on the ability of other firms to increase their own output in response to a contraction by the defendants. Indeed it is usually best to derive market share *from* ability to exclude other sources of supply. This is the method the Department of Justice adopted in its Merger Guidelines. Cf. Landes & Posner, *supra*; George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28 J.L. & Econ. 555 (1985). If the definition of the market builds in a conclusion that there are no significant additional sources of supply and no substitutes from the consumers' perspective, then the market share indicates power over price. But a calculation of the Blues' share of current coverage in Indi-

ana does not capture the possibility of new entry and expanded sales by rivals, and this is why the district court properly held that the geographic market "is regional, if not national." This larger market may not seem useful from the perspective of consumers in Indiana, who must obtain their insurance from firms offering it there. It is highly pertinent, however, from the perspective of the Blues' rivals and potential rivals, and therefore from the perspective of constraints on the Blues' ability to raise price. The Blues' rivals, whose mobility is not restricted, protect consumers, whose mobility is restricted.

The district court therefore did not commit a legal error or make a clear error in finding the facts. So far as the record stands, the Blues lack market power and are therefore entitled to adopt a PPO plan without further scrutiny under the Sherman Act.

*Ball Memorial,* 784 F.2d at 1335–37.

In *Board of Regents v. NCAA,* 707 F.2d 1147, 1159 (10th Cir.1983), *aff'd* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the court stated:

> In monopolization cases the court reaches for the degree of market power possessed by a firm with an extremely large market share. *See* 2 E. Kintner, *Federal Antitrust Law* § 12.6 at 352, 356–57 (1980) (collecting cases and noting that the market share must approach 80% of the relevant market).

Plaintiffs point out this is dicta because the Tenth Circuit did not consider the plaintiffs' monopolization claim. *See* 707 F.2d at 1159 n. 16. They further explain the court's statement cannot be interpreted to mean monopoly power requires in all cases a showing of 80% market share. The discussion in the section of the Kintner work cited by the Tenth Circuit concerned cases in which monopoly power was inferred from market share alone. *See* 2 E. Kintner, *Federal Antitrust Law* § 12.7 at 357 (1980). Kintner goes on to explain that in cases when a defendant's market share is less than the 80% figure, "monopoly power

may [nevertheless] be inferred from the defendant's market position after consideration of the market share in relation to the characteristics of the relevant market." *Id.,* § 12.5 at 351. Thus, Kintner concludes that where the defendant's market share exceeds a level of approximately 50%, "a detailed inquiry into other market characteristics is necessary" in assessing a monopolization claim. *Id.,* § 12.7 at 358.

The Tenth Circuit's statement in NCAA must also be considered in light of the court's more recent comments in *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.,* 783 F.2d 159 (10th Cir.1986). The court stated:

> It is generally agreed that while market share is indicative of market power, it is not the sole matter to be considered in assessing a defendant's market strength. Evaluating a firm's ability to achieve a monopoly by controlling prices and eliminating competition is a complex assessment based on as much information as is available to provide one with a broad understanding and appreciation of the market and competition in general. We believe that market power includes an examination of a defendant's market strength by analyzing many factors. [These factors are] largely dependent on the individual facts of any case....

*Shoppin' Bag,* 783 F.2d at 162.

The Court is admittedly troubled with plaintiffs' monopolization claim. The *Ball Memorial* analysis certainly weighs in defendant's favor. There are factual distinctions between that case and the present one. In *Ball Memorial* BCBS of Indiana *kept* its traditional indemnity insurance plans on the market and simply attempted to introduce an *additional* PPO, making it available to *all* competing providers on a bid basis. It should be clear from our analysis of plaintiffs' Section 1 claims that BCBS Indiana's course of action was well advised. Of course, that distinction has little if any bearing on the question of monopoly power under Section 2. Further, the Court recognizes the Tenth Circuit's remarks about market power in *Shoppin'*

*Bag,* quoted above, regarded a Section 2 attempt to monopolize claim, and may be limited to that context.

Nevertheless the particular economic status of BCBS Indiana, as found in *Ball Memorial,* does not mean *ipso facto* all BCBS plans across the nation lack market power for purposes of a Section 2 monopolization claim. There is evidence BCBSK is significantly larger than its biggest competitor; the size and number of BCBSK's competitors are different than found in *Ball Memorial;* there is an overwhelming customer preference for BCBSK insurance plans in this state; and more. Plaintiffs have provided authorities affirming findings of monopoly power by defendants with greater than a 50% share of the relevant markets. *See, e.g., Syufy Enterprises v. American Multicinema, Inc.,* 783 F.2d 878 (9th Cir.1986) (evidence was sufficient to support finding of monopolization where defendant had market share of 60–69% in highly fragmented market); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975), *cert. denied* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976) (market shares ranging from 45–70% sufficient to constitute monopoly when other competitors small); *United States v. Besser Mfg. Co.,* 96 F.Supp. 304 (E.D.Mich.1951), *aff'd* 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952) (65% market share sufficient for monopoly power where balance of industry divided among 50 competitors the largest of which had market share of less than 8%).

The Court views plaintiffs' monopolization claim with some hesitation, but at this stage cannot conclude defendant has clearly shown it is entitled to summary judgment thereon. The present motion is denied with regard to the Section 2 monopolization claim. Plaintiffs will be allowed to present their evidence to the jury, but defendant is free to pursue its challenge to this claim at the close of that evidence.

### Attempt to Monopolize

To support a claim of attempted monopolization under Section 2, plaintiffs must establish four items: (1) a dangerous probability of success; (2) acts in furtherance of the attempt, although these acts need not be successful; (3) specific intent to monopolize; and (4) a relevant market, within which the attempted monopolization occurred. *Shoppin' Bag,* 783 F.2d at 161; *Olsen v. Progressive Music Supply, Inc.,* 703 F.2d 432, 436–37 (10th Cir.1983). Defendant argues plaintiffs fail to show either a dangerous probability of success in monopolizing the relevant market, or specific intent to monopolize.

The *Shoppin' Bag* case addressed in detail the element of dangerous probability of success. The court noted that traditionally, this element may be shown through the market power of the predatory defendant, which in turn may be shown through market share. 783 F.2d at 161. The parties stipulated in that case to the relevant geographical market, and the relevant product market was the subject of a special interrogatory. The court continued:

At the very least it must be shown how much of the relevant market a defendant controls if market power is to be evaluated. Of course, other conduct or circumstances may also be considered. *Olsen, supra,* at 437, (aggressive conduct of the plaintiff was considered in plaintiff's failure to establish that there was a dangerous probability that the defendant could monopolize the relevant market); and *U.S. Steel, supra,* [*United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948)], (where the Supreme Court not only examined U.S. Steel's declining market percentage over a 45-year period but also noted the other companies and means of production that U.S. Steel had acquired during the period.) Many cases also look at market trends, number and strength of other competitors, and entry barriers.

It is generally agreed that while market share is indicative of market power, it is not the sole matter to be considered in assessing a defendant's market strength. Evaluating a firm's ability to achieve a monopoly by controlling prices

and eliminating competition is a complex assessment based on as much information as is available to provide one with a broad understanding and appreciation of the market and competition in general. We believe that market power includes an examination of a defendant's market strength by analyzing many factors. Although largely dependent on the individual facts of any case, examples of factors to be considered can be found in the instructions given in this case as quoted below. The trial court here instructed the jury that:

> The second element you must consider in this case is whether there was a dangerous probability that King Soopers could succeed in monopolizing the relevant market. "Dangerous probability" means the probability of attaining the power to control prices in the market and the power to exclude competition from the market.

> The greater a firm's market power, the greater the possibility of successful monopolization.

> In order to be found liable for attempted monopolization, a firm must possess market strength—market strength that approaches monopoly power; that is, the ability to control prices and exclude competition.

> Market strength is often indicated by market share. Market share alone, however, is not enough to determine a firm's capacity to achieve monopoly.

> Other factors you should consider include the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, consumer sensitivity to change in prices, innovations or developments in the market, whether the defendant is a multimarket firm, as well as other evidence presented to you that you may deem persuasive regarding defendant's market strength.

*Id.* at 161–62. The Section 2 attempted monopolization claim against defendant in *Shoppin' Bag*, which held a *34–38%* share of the relevant market, was held properly submitted to the jury with the foregoing instructions. *Id.*, at 161, 163.

▮▮▮ In this case BCBSK has indicated no substantial objections to the 61% market share figure. In purely numerical terms that market share indicates almost twice the market strength of the defendant in *Shoppin' Bag*, with a correspondingly greater possibility of successful monopolization. But even disregarding defendant's increased market share in this case, *Shoppin' Bag* clearly indicates it is the factfinder's prerogative to hear the evidence, and weigh the factors identified, in determining a defendant's dangerous probability of success. Those factors are sufficiently satisfied in this case to create a question of fact for the jury.

▮▮▮ The specific intent necessary to prove an attempt to monopolize is a specific intent to accomplish the forbidden objective, an intent going beyond the mere intent to do the act. *Aspen Skiing Co. v. Aspen Highlands Skiing*, 472 U.S. ——, ——, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467, 480 (1985). Specific intent may be inferred from predatory behavior:

> " 'Proof of specific intent to engage in predation may be in the form of statements made by the officers or agents of the company, evidence that the conduct was used threateningly and did not continue when a rival capitulated, or evidence that the conduct was not related to any apparent efficiency.' "

*Aspen Skiing*, 105 S.Ct. at 2860 n. 39, 86 L.Ed.2d at 484 n. 39, *quoting* R. Bork, The Antitrust Paradox at 157 (1968). The court upheld a jury verdict on an unspecified Section 2 claim because the defendant, in refusing to continue a joint product market effort with its competition, "elected to make an important change in a pattern of distribution that originated in a competitive market and had persisted for several years," adversely affecting plaintiff, customers, and defendant itself; the court found the jury could well have concluded defendant was engaged in predatory behavior by attempting to exclude rivals on

some basis other than efficiency. *Id.*, 105 S.Ct. at 2857–62, 86 L.Ed.2d at 481–86.

In light of *Aspen*, defendant BCBSK cannot plausibly argue its conduct in this case is incapable of being characterized as predatory, supporting an inference of specific intent to monopolize. BCBSK's termination of Wesley was an election to make an important change in the pattern of distribution of health care in Sedgwick County, a pattern that originated in a competitive market and persisted for several years. Both that termination and the contracts entered into with the remaining Wichita hospitals imposed costs on plaintiff Wesley, plaintiff HCP (defendant's rival), the other hospitals, BCBSK itself, and very possibly, consumers. This conduct was unmistakably "exclusionary", tending both to impair the opportunities of defendant's rivals, and either not furthering competition on the merits or doing so in an unnecessarily restrictive way. Wholly aside from the fair characterization of BCBSK's conduct as predatory, as previously discussed in our Section 1 analysis, there remain significant questions of fact concerning the precise reasons defendant acted as it did. If the jury concludes defendant conducted itself in these matters for any reason other than legitimate business purposes, that conclusion would support an inference of specific intent without regard to the predatory nature of its conduct.

Defendant does not argue the other elements of an attempted monopolization claim (predicate acts and relevant market) have not been established plaintiffs. Accordingly, defendant is denied summary judgment on plaintiffs' claims of attempted monopolization in violation of Section 2.

### Conspiracy to Monopolize

■ To establish a conspiracy to monopolize in violation of Section 2, plaintiffs must show an agreement, overt acts in furtherance of the agreement, and a specific intent to monopolize. *Instructional Systems Develop. Corp. v. Aetna Casualty*, 787 F.2d 1395, 1402 (10th Cir.1986). The gravamen of the offense is the intent to achieve the unlawful result. *Id.* at 1402.

A relevant market need not be established because specific intent to monopolize is the heart of the charge. *Olsen*, 703 F.2d at 438.

■ From our prior analysis it is clear defendant is not entitled to summary judgment on plaintiffs' claim of conspiracy to monopolize. The Court determined in the discussion of plaintiffs' Section 1 claims there is substantial evidence from which the jury can find an agreement between BCBSK and the other Wichita hospitals, which contemplated within its terms the termination of Wesley as a contracting provider. That termination by BCBSK certainly qualifies as an overt act in furtherance of the agreement. As discussed in the analysis of plaintiffs' claim of attempted monopolization, the jury may infer specific intent to monopolize from either, or both, the actual reasons underlying defendant's conduct or the predatory nature.

Defendant is denied summary judgment on plaintiffs' Section 2 claim of conspiracy to monopolize.

### PLAINTIFFS' STATE LAW CLAIMS

Counts VII–XVII of the complaint contain plaintiffs' pendent state and common law claims. Count VII alleges an unlawful trust violating K.S.A. 50–101. Count VIII alleges a combination in restraint of trade and free competition in violation of K.S.A. 50–112. Count IX alleges a violation of K.S.A. 50–132 by a conspiracy or combination for the purpose of monopolizing. Plaintiffs claim in Count X defendant has engaged in a civil conspiracy, actionable in tort. Count XI alleges a violation of K.S.A. 40–19c01 *et seq.*, BCBSK's special enabling act. In Count XII plaintiffs claim the proposed termination of Wesley is void as contrary to public policy and defendant's enabling act. Count XIII alleges breach of Wesley's contracting provider agreement. Count XVI alleges the nonassignment of benefits provision of BCBSK's insurance policies with subscribers is void and unenforceable. Counts XIV, XV and XVII contain various claims of tortious interference.

Defendant contends the premise of all seventeen pendent claims is that BCBSK is required by Kansas law to contract with, and accept assignment of subscribers' benefits to, any hospital agreeing to the terms of the provider agreements. It argues that premise is invalid in light of the Kansas Supreme Court's decisions in *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 608 P.2d 890 (1980) (*"Augusta I"*), and *Augusta Medical Complex, Inc. v. Blue Cross*, 230 Kan. 361, 634 P.2d 1123 (1981) (*"Augusta II"*).

Defendant relies on *Augusta* I for the proposition BCBSK's termination of Wesley as a contracting provider would be neither a violation of defendant's enabling act nor a breach of contract. *Augusta* I concerned Blue Cross' attempt to switch from retrospective reimbursement arrangements with providers to mandatory prospective reimbursement contracts, a change in contract urged upon Blue Cross by the Kansas Insurance Commissioner. 227 Kan. at 471, 608 P.2d 890. The existing contracts of providers that did not voluntarily agree to the new prospective reimbursement contracts were terminated by Blue Cross. Twenty-one hospitals filed a declaratory judgment action, seeking specific performance of the contracts and injunctive relief. *Id.*, at 470, 472, 608 P.2d 890. The trial court issued a temporary injunction, and Blue Cross appealed. *Id.* The Kansas Supreme Court held the injunction improperly issued because, under the terms of the contracts in question, Blue Cross possessed and properly exercised a clear right to terminate the hospitals without cause on six months notice. *Id.*, at 475, 608 P.2d 890. The court determined the contracts were neither illegal nor contrary to public policy. The parties specified a method of mutual termination, "and we see no reason why the right of termination at the will of either party should not be honored by the parties and enforced by this court.... When the right to terminate a contract is absolute under the clear wording in the agreement the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective." 227 Kan. at 476, 608 P.2d 890.

■ The critical factual distinctions between that case and the present are obvious. In *Augusta* I Blue Cross terminated the hospitals' contracting provider agreements in order to implement new contracts with different reimbursement formulas, indicating its desire all hospitals continue as participants under the new arrangement. In stark contrast, there is in this case no question of a hospital refusing to join BCBSK's efforts; defendant has terminated and is refusing to contract with Wesley, a willing hospital. Nor is there any indication defendant's conduct was encouraged by the State Insurance Commissioner. In this context defendant's reliance on the Supreme Court's statement "motive ... is irrelevant," is unpersuasive. Clearly, the court there considered both the purpose of the terminations and the public policy favoring health care cost containment. Read literally, *Augusta* I stands for the principle defendant may exercise its right of terminating contracting provider agreements when undertaken in furtherance of its legislative mandate. In the present case it remains to be shown defendant's termination of Wesley, without offering the hospital a new provider agreement, serves the same or other permissible goals. The question whether BCBSK has the power to terminate a willing hospital and arbitrarily exclude it from participating status was never presented to the court, much less ruled on, in *Augusta* I.

In *Augusta* II, the Kansas Supreme Court addressed the enforceability of Blue Cross' refusal to accept assignment of subscribers' benefits to noncontracting hospitals. Following the termination of the hospitals as contracting providers in *Augusta* I, a number of those hospitals refused to participate in Blue Cross' new prospective reimbursement contracts. They instituted a declaratory judgment action to determine whether the non-assignment provision of subscribers' contracts was enforceable. *Augusta* II, 230 Kan. at 361-62, 634 P.2d 1123. The court first reviewed the law and

public policy supporting free assignment of choses in action. Although recognizing the desirability of free alienation of choses in action, the court stated that principle was subject to other competing considerations of public policy. *Id.*, at 363–64, 634 P.2d 1123. After reviewing Blue Cross' enabling act the court found "Blue Cross has a clear legislative mandate to control costs in member hospitals. Inherent in that dictate is a directive to encourage hospitals to become members." *Id.*, at 365, 634 P.2d 1123. K.S.A. 40–1811(c) specifically provides Blue Cross' efforts "shall include ... a continuing effort ... through a combination of education, persuasion and financial incentives and disincentives to control costs and to encourage participating hospitals to control costs...." The court concluded:

> [T]he provision in the subscribers' contracts rendering benefits personal and nonassignable is vital to the functioning of defendant Blue Cross as a mutual non-profit hospital service corporation in carrying out its statutory duties and obligations and, accordingly, public policy requires that the same be upheld as valid and enforceable.

230 Kan. at 367, 634 P.2d 1123. *See also Obstetricians-Gynecologists, P.C. v. Blue Cross and Blue Shield of Nebraska,* 219 Neb. 199, 361 N.W.2d 550 (1985) (the nonassignment of benefits clause is "a valuable tool in persuading health care providers to participate ... in voluntary cost-effectiveness programs and accept set fees for health services, keeping health care costs down and passing savings on to subscribers"; a far stronger public policy than that of free alienability of choses in action); and *Kent General Hospital, Inc. v. Blue Cross and Blue Shield of Delaware, Inc.,* 442 A.2d 1368 (Del.1982) (following *Augusta* II but recognizing the holding as an exception to general rule of free alienability of choses in action).

■ The factual distinctions between the present case and *Augusta* II are, again, obvious. The sole reason the court in *Augusta* II permitted enforcement of Blue Cross' nonassignment of benefits provision was that Blue Cross needed that financial disincentive to *encourage* hospitals to become participating providers subject "to the restrictions and controls indigenous to membership." 230 Kan. at 366, 634 P.2d 1123. In this case BCBSK has undertaken the unilateral termination of a hospital willing to continue as a participating provider. Defendant cannot argue its nonassignment of benefits policy is intended under these circumstances to serve the statutory purposes relied on by the court in *Augusta* II.

■ In this distinction defendant has removed itself from the *Augusta* II exception to the well-established policy favoring free alienability of choses in action. BCBSK puts forth no new or different justifications for refusing to honor assignment of subscribers' benefits to hospitals it has unilaterally terminated from participating status; defendant simply contends *Augusta* II permits defendant to refuse to honor assignment of benefits under any circumstances. It does not.

Any lingering doubts on this issue are dispelled by the Second Restatement of Contracts. "A contractual right can be assigned unless ... (c) the assignment is validly precluded by contract." Restatement (Second) of Contracts § 317(2) (1981). But "[i]f there is no forfeiture [provision that an attempt to assign forfeits the right to payment of money], and the obligee joins in demanding payment to the assignee, a contractual prohibition which serves no legitimate interest of the obligor is disregarded." *Id.,* § 322, Comment b.

*Augusta* I and II provide defendant no relief from plaintiffs' pendent state claims in this case. Failing to establish the legality of Wesley's termination as a contracting provider, and BCBSK's refusal to honor assignment of benefits, defendant is denied summary judgment on Counts VII–XVII of the complaint.

## MOTION FOR RECONSIDERATION OF SEPARATE TRIALS

■ In the order dated January 8, 1986 adding HMOK as a counterclaim plaintiff and HCA as a counterclaim defendant, the

Court also granted plaintiffs' motion for separate trials of the complaint and the counterclaim, with leave granted defendant to seek reconsideration of that ruling following discovery. (Rec. 24.) BCBSK and HMOK now seek reconsideration of the ruling on separate trials, and raised the matter before the Court during oral argument on the motion for summary judgment, at which time it was taken under advisement. Now armed with something more than a passing familiarity with the facts of this case, the Court is convinced separate trials on the complaint and counterclaim are justified. The order of separate trials is affirmed, and defendant's motion for reconsideration of that ruling is denied.

IT IS ACCORDINGLY ORDERED this 23 day of May, 1986 defendant Blue Cross and Blue Shield of Kansas, Inc. is granted summary judgment on the claims of plaintiffs Walter L. Reazin, M.D., and New Century Life Insurance Co., under Section 4 of the Clayton Act, 15 U.S.C. § 15. Defendant's motion for summary judgment is in all other aspects denied.

IT IS FURTHER ORDERED the motion of Blue Cross and Blue Shield of Kansas, Inc., and HMO Kansas, Inc., for reconsideration of the order of separate trial on their counterclaim is denied.

Trial to the jury on plaintiffs' complaint will begin Tuesday, July 22, 1986, at 9:30 A.M. The parties shall file their suggested jury instructions on or before Friday, July 18, 1986. Counsel for all parties shall report to Court chambers on Monday, July 21, 1986, at 2:00 P.M. for a conference in anticipation of trial.